1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10
11  RANDY BAKER,                        No. 2:07-cv-00188 JCW

12            Petitioner,               ORDER
            vs.
13
    MICHAEL EVANS,
14
              Respondent.
15

16

17        Petitioner Randy Baker is a prisoner in the custody of the California

18  Department of Corrections.  He seeks a writ of habeas corpus pursuant to 28

19  U.S.C. § 2254.  Respondent Michael Evans is the Warden of Salinas Valley State

20  Prison.  I have reviewed the petition, the respondent's answer, the traverse, the

21  record of petitioner's trial, and lodged documents.  I hold that Baker is not entitled

22  to the relief requested and order the petition denied.

23

24                                  **I.**

25        In February 2003, Baker was convicted of 73 counts of sex offenses

26  involving three minor victims over a period of thirty-one years.  [Ans. at 1;

    Lodged Document ("LD") 4 at 1.]  The following statement of facts and

footnotes 1-6 are excerpted from the unpublished opinion of the Third District

Court of Appeal and is presumed correct. 28 U.S.C. § 2254(d)(2), (e)(1).

By amended information, defendant was charged with the following crimes:

Against D.B. (counts one through thirty): One count of aggravated sexual assault in the form of rape ([Cal.] Penal Code [footnote omitted] § 269, subd. (a)(1), 261, subd. (a)(2)), and 29 counts of lewd acts on a child ([Cal. Penal Code] § 288, subd. (b)(1)).

Against C.F. (counts thirty-one through sixty): 30 counts of lewd acts on a child ([Cal. Penal Code] § 288, subd. (b)(1)).

Against L.L. (counts sixty-one through seventy-four): One count of a lewd act on a child ([Cal. Penal Code] § 288, subd.(a)), 11 counts of lewd acts on a child ([Cal. Penal Code] § 288, subd. (b)(1)), one count of rape ([Cal. Penal Code] § 261, subd. (a)(2)), and one count of sodomy ([Cal. Penal Code] § 286, subd. (c)(2)).

A
*D.B.*

Defendant is the father of D.B., but was never married to D.B.'s mother.  Defendant was born on August 9, 1963. D.B. was born on February 24, 1987.  D.B. lived with her mother until she was eight years old.  Between December 1998 and October 2000, D.B. lived with defendant and his current wife, Dharma Baker.[1]  D.B. was between 11 and 13 years old.

D.B. was 11 or 12 the first time defendant touched her in an inappropriate manner.  Defendant told D.B. to take off her shirt and he kissed her neck.  Defendant also made D.B.'s younger brother touch her breast.

D.B. was 12 the next time defendant assaulted her.  D.B. went into defendant's room  and he was looking at pornography on his computer.  Defendant exposed himself to D.B. and asked her to take off her shorts.  D.B. did as she was told.  Defendant showed D.B. pornography, masturbated in front of her, and had sex with her.

After that, defendant made D.B. have sex with him repeatedly. D.B. estimated defendant had sex with her around 50 times in his room, once in her room, and once in the living room.  D.B. testified that once defendant gave her tequila, led her outside, and then had sex with her.  D.B. also testified defendant got her drunk more than once.

D.B. testified that defendant orally copulated her and made her orally copulate him.  She estimated that this conduct occurred several times in her room and his room.  Once defendant attempted to sodomize D.B., but he was unsuccessful.  Defendant also used sex toys (including a silver dildo, a small vibrator, and a black dildo) with

---

[1]  Not out of disrespect, but for the sake of clarity, we shall refer to Dharma Baker as Dharma.

D.B. during his sexual assaults on her. Those toys were stored in an unlocked cabinet above his bed.

When they were around the house, defendant would grab D.B.'s bottom and slide his hands up her shirt -- sometimes when Dharma was nearby. D.B. said that defendant told her he did this when Dharma was close by because it excited him because he might get caught.

D.B. testified that defendant took nude photographs of her. D.B. testified defendant showed her pictures of nude women stored in a soft cover silver brochure entitled "Diamond Perforated & Expanded Metals" (hereafter Diamond Metals book). Those photographs included pictures of D.B.'s mother posing nude and pictures of her engaged in sexual acts. Defendant also showed D.B. photographs of Dharma having sex with another woman.

There were three computers in the house: an old laptop, Dharma's computer, and defendant's computer. D.B. testified the children and Dharma were not allowed to use defendant's computer. D.B. did not have the password to use defendant's computer. D.B. testified defendant used his computer to show D.B. pictures of nude women.

D.B. testified that those pictures were of young girls -- some posing, some with sex toys, and some with animals. The images from the computer were similar to those contained in a silver-colored binder entitled "Framing Fabrics."

D.B. had a pregnancy scare and testified she asked Dharma to help her with a pregnancy test. At defendant's insistence, D.B. told Dharma the reason she might be pregnant was because she had sex with her cousin at a family gathering. At trial, D.B. claimed defendant threatened her if she told Dharma anything else. D.B. did not say that defendant had threatened her for months after she reported these crimes. In October 2000, defendant threw D.B. out of his house.

On direct examination, D.B. testified that she considered herself a liar when she was living with defendant. She would lie to get out of petty things. She testified, however, that she would not lie about these accusations. She also denied she told C.F. that she had lied to the police about these accusations.

The first time D.B. disclosed to anyone that defendant was molesting her was to her friend Daniel D. She did this about a month and one-half before defendant threw her out.

D.B. disclosed the molestations to her mother two weeks after D.B. went back to live with her. When her mother threatened to send D.B. back to defendant's house, D.B. told her mother defendant had repeatedly raped her.

D.B.'s mother did not believe D.B. at first. D.B. then told her mother about the nude pictures defendant had taken of D.B.'s mother and the things defendant had told D.B. about where and how her mother had sex with defendant. At that point, they reported the accusations to the police.

On December 8, 2000, Sacramento Sheriff's Deputy David Pittack took the report from D.B. that defendant had molested her.

After D.B. reported the molestations to the police, she made a pretext telephone call to defendant. She told him she was pregnant. Defendant hung up on her. Defendant was arrested on January 8, 2001.

D.B. admitted on cross-examination she considers herself manipulative and a good liar. She habitually lied. During cross-examination, defendant's counsel pointed out that D.B. had never before reported some of the facts to which she testified on direct examination. Defense counsel also pressed D.B. on prior inconsistent statements she had made in prior proceedings.

Cross-examination also disclosed D.B. believed defendant and Dharma were very strict. D.B. testified her mother was much more lenient and easier to live with than defendant.

Sheridan Whalen was the nurse who examined D.B. after she reported the molestation. Whalen testified that D.B.'s hymen was extremely narrow and had evidence of healed trauma that was most consistent with chronic sexual abuse.

D.B.'s mother testified defendant's mother, Lettie Baker, told her that D.B. had accused defendant's father (D.B.'s grandfather) of molesting her. D.B.'s mother further testified D.B. denied making this accusation and denied her grandfather had molested her.

B
*C.F.*[2]

C.F. was born in 1973, and was 28 years old at the time she testified. Defendant was her mother's first husband.[3]

C.F. testified defendant started molesting her when she was almost seven years old and continued to molest her until she was almost 18. C.F. estimated defendant had sex with her more than 200 times.

Early on, defendant engaged in oral copulation with C.F., masturbated in front of her, ejaculated on her, inserted objects into her anus and vagina, and required her to insert objects into his anus.

---

[2] "While our disposition reverses the convictions on all counts as to C.F. and L.L., defendant concedes this evidence would have been admissible under Evidence Code section 1108. Thus, we summarize the facts of the crimes against these victims." The transcript reflects that C.F. testified that Petitioner was her mother's first "husband." [RT 505.] The entirety of the record shows that she actually said, or meant to say, "cousin" instead of "husband." [See, e.g., Aug. RT 5; RT 495, 651, 741, 747, 1025.] C.F.'s mother used to take C.F. and her sister to Petitioner's apartment so that he could babysit them. [RT 506.]

[3] The transcript reflects that C.F. testified that Petitioner was her mother's first "husband." [RT 505.] The entirety of the record shows that she actually said, or meant to say, "cousin" instead of "husband." [See, e.g., Aug. RT 5 ; RT 495, 651, 741, 747, 1025.] C.F.'s mother used to take C.F. and her sister to Petitioner's apartment so that he could babysit them. [RT 506.]

The first time defendant had intercourse with C.F. was when she was 12. Between the time C.F. was 13 or 14 to the time she was 17, defendant repeatedly assaulted her sexually. C.F. testified this happened at least two or three times a week. Defendant always started by touching her, followed that by oral copulation, and then intercourse.

Defendant took pictures of C.F. in sexually suggestive poses, partially clothed, and with him taking her clothes off. C.F. identified several pages of nude photographs of C.F. in the silver Diamond Metals book. C.F. testified she was 14 or 15 when those photographs were taken. C.F.'s sister testified she thought C.F. looked like she was 13 or 14 years old in those pictures. C.F. also provided a number of family photographs of her ranging from age 12 to 21 to assist the jury in dating the nude photographs.

C.F. first told her mother and defendant's mother that defendant was molesting her when she was about 11 years old. They did not believe her. She repeated her accusations to her first husband when she was 15 or 16 years old[4] and later to a counselor at Kaiser.

C.F. decided to report the molestation to the police when she saw defendant at a 7-Eleven near her home. She testified she decided to report it "because I knew he was still" molesting children. At least five or six months, however, passed between this confrontation and the date she reported the crimes to law enforcement on about January 28, 2001.

C.F. admitted that when she was 17 years old, she falsely accused her first husband and her mother of sexually assaulting her. She claimed her husband raped her while her mother held her down. She made this false accusation so she would not have to return to her mother's home. In a separate incident, C.F. also accused her stepfather of molesting her.

On cross-examination, C.F. admitted she told the district attorney that D.B. had lied. C.F. claimed she did this at the direction of defendant's investigator, Chuck Pacheco. C.F. also wrote a letter at Pacheco's insistence that said that D.B. had learned about how to use dildos by overhearing defendant and Dharma talk about sex and watching them through a window without their knowledge.[5] C.F. wrote that she encouraged D.B. to tell the truth, but D.B. said that she wanted defendant to die in prison because he was an "asshole." At trial, C.F. claimed this letter was false and that she had been paid to write it. C.F. also testified that Pacheco offered her money to sign a document that stated defendant never had sex with her. She refused this offer.

---

[4]   He was not yet her husband at the time. [See RT 552, 640, see also RT 504.]

[5]   D.B. confirmed she made this statement.

# C
## *L.L.*

L.L. was born in 1971 and was 30 years old when she testified. L.L. is C.F.'s sister.

L.L. was eight the first time defendant molested her. The assaults spanned over the next seven years. L.L. could not remember the details of the early assaults. Generally, she testified that defendant engaged in kissing and oral copulation with her. When L.L. reached the age of 9 or 10, defendant put his fingers inside of her and sodomized her regularly. Later on, defendant engaged in oral copulation, kissing, sodomy, and inserting his fingers in her vagina. All told, she estimated that defendant sodomized her about 50 times. He had oral sex with her 100 times.

The last time defendant assaulted L.L. she was about 17. She had finished paying defendant for a car and went to his house to get keys or paperwork. Defendant took her to his room and raped and sodomized her.

When she was 20, she told her mother that defendant had molested her. In 1993, 1998, and 2001, L.L. reported these molestations to three separate mental health care professionals.

The district attorney's office contacted L.L. before she reported this crime. On direct examination, L.L. claimed she never directly answered their question of whether she had been molested. On cross-examination, she testified she told the district attorney that she did not know anything about this case.

L.L. was next contacted by defense investigator Pacheco. L.L. told Pacheco she had not been molested. L.L. told Pacheco that her sister, C.F., was a habitual liar and could not be believed. At trial, however, L.L. testified that she did not believe C.F. was lying about being molested.

Pacheco and L.L. met several times after that first meeting. In those meetings, L.L. told Pacheco that defendant had molested her. According to L.L., Pacheco offered to buy her recently deceased son a headstone and give her $5,000 if she did not testify and instead sign an affidavit that she did not have sex with the defendant. L.L. tape-recorded one of those meetings with Pacheco. L.L. testified it was this bribery attempt that made her report the molestations to the police.

On cross-examination, L.L. admitted that she went to defendant's home and told his parents that her sister, C.F., "was a piece of shit" and "a liar." Even after he was arrested, L.L. told defendant and Dharma that she did not believe defendant molested C.F. and that L.L. did not trust C.F.

# D
## *Computer And Photographic Evidence*

Prior to defendant's arrest, Deputy Pittack participated in a search of defendant's home. In the bedroom, next to the computer, he found pornographic photographs that appeared to have been

6

downloaded from the Internet.  The photographs were printed on typing paper: some were loose and others were bound in the silver colored binder entitled "Framing Fabrics." Deputy Pittack found a number of sex toys in the headboard of the bed.  The officers found the Diamond Metals book in the garage on a shelf full of mechanic's books.

Deputy Pittack seized three computers from the house.  One of the computers contained photographs of child pornography and adult pornography and Web site information related to these subjects. These photographs included bestiality, pornographic images of young females, and banners that advertised "Lolitas,"[6] "Asians" and "Teens."  Almost 1,500 of the recovered images had been deleted from the computer between  October 23, 2000 and October 25, 2000 - - shortly after defendant threw D.B. out of his home.

E

*Defendant's Case*

Defendant testified on his own behalf.  He repeatedly denied molesting D.B., C.F. and L.L.  In addition to his generalized denials, defendant specifically denied showing D.B. any pornography.  He denied he told D.B. about his sex life with her mother.  He also denied he told D.B. to make up a story about the potential father of her child when she thought she might be pregnant.

In his attack on D.B.'s credibility, defendant offered evidence of several lies D.B. told.  For example, during a custody proceeding involving D.B., D.B. accused defendant of physically assaulting her. According to defendant, in court during those proceedings, she admitted she was lying about those allegations.  Dharma also testified that D.B. lied to get what she wanted.  Further, a neighbor, Ernesto C., testified that in October of 2000, he heard D.B. say that if she had to go back and live with the defendant that she would call the police and say that he molested her.

Defendant also offered the jury a possible motive for D.B.'s accusations.  Dharma testified that D.B. was a troubled child, and therefore they had strict rules for her.  These rules included chores, that she go to school, do her homework, and do her best in school. Defendant testified D.B. was eager to go back and live with her mother.  The day before he threw her out of his house, D.B. had asked to live with her mother again.  The next day defendant found out D.B. had accused him of domestic violence.  When he found out, he evicted her from his home.

As to L.L. and C.F., defendant claimed the only contact he had with them was that he had babysat them less than 10 times when he was 17 years old.  He further testified he had a single consensual sexual encounter with C.F. when she was 18 years old.  Defendant

---

[6]  Deputy Frisby testified 'Lolita' typically refers to child pornography on the Internet.  On cross-examination, Frisby conceded that some legitimate sites used that term as well.

also admitted he had several prior convictions: a 1987 conviction for assault on D.B.'s mother; a misdemeanor conviction for receiving stolen property; a misdemeanor conviction for assault on a emergency technician; and a conviction for a drug and gun charge.

Defendant presented the testimony of Lyn Tufts, D.B.'s great aunt. Tufts lived in the same house as D.B. and defendant for an extended period of time. Tufts never saw defendant abuse his wife or children. Tufts testified that D.B. confided in her about sexual matters, but never claimed defendant molested her. D.B. also told Tufts that she had had sex with her cousin at a family gathering in Bakersfield and was afraid she was pregnant.

[LD 4 at 2-13.]

In February 2003, the trial court sentenced Baker to a determinate term of 432 years imprisonment and an indeterminate term of 15 years to life imprisonment, consecutive. [LD 4 at 13-14; Clerk's Transcript ("CT") 17, 702-05.] Baker timely appealed from his conviction. The California Court of Appeal reversed Baker's convictions on the counts relating to two victims, C.F. and L.L., pursuant to *Stogner v. California*, 539 U.S. 607 (2003), which held that the extended statute of limitations provision provided in California Penal Code section 803(g) violated the ex post facto clause. [*See* Ans. at 2.] The court of appeal affirmed Baker's convictions on the counts relating to the third victim, D.B. [LD 4 at 42.] The amended abstract of judgment reflects Baker's amended sentence as a determinate term of 174 years and an indeterminate term of 15 years to life, consecutive. [LD 4 at 42; LD 5; CT 274-89.]

## II.

A person in custody pursuant to the judgment of a state court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 n.7

(2000).  Baker asserts that he suffered violations of his rights as guaranteed by the

United States Constitution.  This case was filed after the enactment of the

Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA), and the petition

is therefore governed by AEDPA.  *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir.

2010).

Under AEDPA, a federal court may not grant a section 2254 habeas petition

"with respect to any claim that was adjudicated on the merits in State court

proceedings" unless the state's adjudication of that claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

I must "first decide what constitutes 'clearly established Federal law, as

determined by the Supreme Court of the United States.'"  *Lockyer v. Andrade*, 538

U.S. 63, 71 (2003), *quoting* 28 U.S.C. § 2254(d)(1)).  To do this, I look to the

"holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the

time of the relevant state-court decision," *id.*, *citing Williams v. Taylor*, 592 U.S.

362, 412 (2000), and consider whether the state court decision was "contrary to, or

involved an unreasonable application of, clearly established Federal law."  *Id.*,

*quoting* 28 U.S.C. § 2254(d)(1)).  Although only Supreme Court law is binding on

the states, Court of Appeals for the Ninth Circuit cases can be relevant persuasive

authority in determining whether a state court decision is objectively

unreasonable.  *See Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999)

("because of the 1996 AEDPA amendments, it can no longer reverse a state court

decision merely because that decision conflicts with Ninth Circuit precedent on a

1  federal Constitutional issue . . .. This does not mean that Ninth Circuit caselaw is

2  never relevant to a habeas case after AEDPA. Our cases may be persuasive

3  authority for purposes of determining whether a particular state court decision is

4  an 'unreasonable application' of Supreme Court law, and also may help us

5  determine what law is 'clearly established'").

6      "Under the 'contrary to' clause, a federal habeas court may grant the writ if

7  the state court arrives at a conclusion opposite to that reached by [the Supreme]

8  Court on a question of law or if the state court decides a case differently than [the]

9  Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at

10  412-13. "Under the 'unreasonable application clause,' a federal habeas court may

11  grant the writ if the state court identifies the correct governing legal principle from

12  [the] Court's decisions but unreasonably applies that principle to the facts of the

13  prisoner's case." *Id.* at 413. "[A] federal court may not issue the writ simply

14  because the court concludes in its independent judgment that the relevant state-

15  court decision applied clearly established federal law erroneously or incorrectly.

16  Rather, that application must also be unreasonable." *Id.* at 411. A federal court

17  making the "unreasonable application" inquiry should ask whether the state

18  court's application of clearly established federal law was "objectively

19  unreasonable." *Id*. at 409.

20      The AEDPA establishes "highly deferential standard for evaluating state-

21  court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997), and "demands that

22  state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537

23  U.S. 19, 24 (2002) (per curiam). Under the AEDPA, "state court findings of fact

24  are presumed correct unless rebutted by clear and convincing evidence or unless

25  based on an unreasonable evidentiary foundation." *Gonzalez v. Pliler*, 341 F.3d

26  897, 903 (9th Cir. 2003), *citing* 28 U.S.C. §§ 2254(d)(2) & 2254(e)(1); *see also*

1    *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  A federal court is bound by a

2    state's interpretation of its own laws.  *Souch v. Schaivo*, 289 F.3d 616, 621 (9th

3    Cir. 2002).

4         In applying these standards of review, a federal district court will "look to

5    the last reasoned state-court decision."  *Van Lynn v. Farmon*, 347 F.3d 735, 738

6    (9th Cir. 2003).  Here, the decision by the court of appeal is the last reasoned

7    decision of the state courts as to most of the questions presented; as to others, I

8    will specify the last-reasoned state court decision where relevant.  *Robinson v.*

9    *Ignacio*, 360 F.3d 1044, 1061 (9th Cir. 2004); *see also Medley v. Runnels*, 506

10   F.3d 857, 863 (9th Cir. 2007) (en banc).

11        Baker raises nine claims in his habeas petition; certain of these overlap and

12   will be discussed concurrently.  Baker's claims have also been grouped by topic in

13   the following discussion: prosecutorial misconduct, improper admission of

14   evidence, ineffective assistance of counsel, and instructional error.  Respondent

15   admits that Baker has exhausted the claims presented in his habeas petition.  [Ans.

16   at 4.]  Respondent alleges subclaim four of Ground 3, denial of counsel, is

17   procedurally defaulted.  [Pet. at 43.]  Respondent alleges that other claims,

18   discussed later, fail to present a cognizable basis for federal habeas relief.

19

20                                            **III.**

21        I will begin with Baker's prosecutorial misconduct claim.  Baker argues that

22   the prosecutor committed misconduct in her opening statement by arguing that the

23   victims' problems in adult life – problems that might affect their credibility as

24   witnesses – were the result of having been molested by the petitioner.  Baker

25   argues that the prosecutor's opening statement was highly prejudicial,

26   argumentative, and speculative.

1    First, Baker argues that "The opening statement of the prosecutor went

2 beyond the bounds of opening statement into argument." [Pet. at 25.]  It

3 "precondition[ed]" the jury to believe that "the dysfunctional state of prosecution

4 witnesses was attributable to defendant's conduct." [*Id*.]  Second, Baker argues

5 that "there was no expert testimony that these problems were related to prior

6 molestation, as opposed to a simple lack of credibility.  There was no justification

7 for the prosecutor to launch into an argument which could not hope to find

8 foundation in the evidence." [Pet. at 26.]  Finally, Baker argues that this conduct

9 was prejudicial.  Baker argues that the prosecutor's argument during opening

10 statement "rather than being an occasion of doubt, should be viewed as

11 corroboration of the truth of their accusations." [Pet. at 23.]  Baker argues that the

12 "credibility of the victim-witnesses was a fundamental issue in this trial." [Pet. at

13 23.]

14    Baker presented this argument to the court of appeal, and it rejected his

15 claim. [LD 4 at 16-19.]  The court of appeal reasoned that the purpose of an

16 opening statement is to "inform the jury of the evidence the prosecution intends to

17 present, and the manner in which the evidence and reasonable inferences relate to

18 the prosecution's theory of the case." [LD 4 at 17-18, citing *People v. Millwee*, 18

19 Cal. 4th 96, 137 (1998).]  It reasoned that the prosecutor's statement gave context

20 for the victim's anticipated testimony, "prepared" the jury for difficulties with the

21 testimony, and "anticipated" defense attacks on witnesses' credibility:

22       Here, the credibility of each of the victims of these crimes was
      central.  The prosecution's description of these victims, their lives,
23      their checkered pasts, and her attribution of their conduct to the fact
      of their molestation gave the jury context for their anticipated
24      testimony.  Further, it prepared the jury for the many difficulties and
      gaps in their testimony.  It also addressed the anticipated evidence
25      that defendant would present that impugned their credibility.  This
      was not misconduct.

26

1  [Lod. Doc. 4 at 18-19.]  Baker also presented this claim to the California Supreme

2  Court in a petition for review.  [LD 6 at 3-6.]  The California Supreme Court

3  denied the claim without comment.  [LD 7.]  Therefore, I accept the court of

4  appeal's decision, the last reasoned decision, "as the basis for the state court's

5  judgment." *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (2000), *citing Ylst*

6  *v. Nunnemaker*, 501 U.S. 797 (1991).

7       The court of appeal's determination that the prosecutor's opening statement

8  did not constitute a violation of Baker's right to due process was neither contrary

9  to, nor an unreasonable application of, clearly established federal law.  *See* 28

10  U.S.C. § 2254(d)(1).  Prosecutorial misconduct, if found, will not "automatically

11  invalidate a conviction." *Furman v. Wood*, 190 F.3d 1002, 1006 (9th Cir. 1999).

12  The United States Supreme Court has explained: "it is not enough that the

13  prosecutors' remarks were undesirable or even universally condemned." *Darden*

14  *v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks and citation

15  omitted).  Instead, "[t]he relevant question is whether the prosecutors' comments

16  so infected the trial with unfairness as to make the resulting conviction a denial of

17  due process." *Id*. (internal quotation marks omitted), *citing Donnelly v.*

18  *DeChristoforo*, 416 U.S. 637 (1974).  "Moreover, the appropriate standard of

19  review for such a claim on writ of habeas corpus is 'the narrow one of due process,

20  and not the broad exercise of supervisory power.'" *Darden*, 477 U.S. at 181,

21  *quoting Donnelly*, 416 U.S. at 642.  That is, "[a] defendant's due process rights are

22  violated if prosecutorial misconduct renders a trial 'fundamentally unfair.'"

23  *Drayden v. Wright*, 232 F.3d 704, 713 (9th Cir. 2000), *quoting Darden*, 477 U.S.

24  at 181 n.13.

25       I conclude that the state court's rejection of Baker's prosecutorial

26  misconduct claim was neither contrary to, nor an unreasonable application of,

clearly established federal law.  There are two reasons.  First, the state court of appeal found that the prosecutor's statement was not misconduct.  This determination is reasonable in light of the record.  Second, even if the prosecutor's statement crossed the line into misconduct, it did not violate Baker's due process rights.

First, the context of the statement takes much of the sting out of Baker's argument.  *See, e.g. Darden*, 477 U.S. at 479.  The prosecutor began by telling the jury:

> Many victims of crimes are not saints nor are they angels.  And as you've probably picked up on in this case, the three victims you are going to hear from are not people you would call angels, not people you would call saints, not necessarily people you would call upstanding citizens.

[LD 17 at 1.]

The prosecuting attorney told the jury a little about each of the three victims, [Aug. RT 2-3], and then said:

> And what you have to decide is are they making it up?  Do they have a motive to lie?  Do the facts not add up?  Because they may -- excuse my words -- seem like crappy people at times.  Does that mean they're lying about everything they ever say?  And that's what you're ultimately going to have to decide.  I want you to keep in mind when you make that decision, that when big things happen, traumatic things happen, it affects people.  And the duration of being molested, the severity of being molested, the lack of family support, poor upbringing, all these can affect whether you turn out to be one of those they call a survivor, somebody who thrives in life even after going through traumatic childhood.

[Aug. RT 4.]

Petitioner's counsel interposed an objection here, saying, "This is not an opening statement."  [Aug. RT 4.]  The trial court responded: "I'm going to overrule the objection.  Counsel is instructed to confine comments to what the evidence will show."  [Aug. RT 4.]  At the conclusion of the prosecuting

attorney's opening statement, petitioner's counsel asked the trial court to strike the entire statement "because I thought the opening statement was pretty much a closing argument as opposed to an opening statement." [RT 188.] The trial court denied the request. [RT 190.] The trial judge did agree to reiterate the instructions regarding attorneys' comments in general and opening statements in particular. [RT 190.] Accordingly, when proceedings resumed, the court instructed the jury:

> Ladies and gentlemen, before we begin with Mr. Peters' [Petitioner's counsel] opening statement, I neglected to issue an instruction that I had intended to make this morning; and that is, first of all, to remind the jury that basically what the attorneys say is not evidence; that opening statements and closing arguments are not evidence. And they are only there to help guide you through your evaluation of the evidence.

[Aug. RT 19.]

In this case, the state court held that the prosecuting attorney did nothing improper because she previewed the evidence and explained how it supported the government's case. The prosecution planned to, and did, introduce evidence of false allegations and inconsistent statements by the state's witnesses. [*See, e.g.,* RT 329, 557-60, 563-64, 670-71.] Moreover, this evidence was to be part of petitioner's defense. [RT 249-50, 382-84, 388, 578, 606-07, 676-78, 681, 843, 1092, 1102-03.] Contrary to petitioner's argument, the comments in the prosecutor's opening statement were not "unfounded" [Pet. at 23; see also Pet. at 26] and did not refer to inadmissible evidence [Pet. at 24]. The prosecutor informed the jury of evidence it expected to present and referred to an anticipated defense.

Second, even if I accept Baker's argument that the prosecutor's opening statement contained improper remarks, there was no constitutional violation. Petitioner is not entitled to relief unless the alleged prosecutorial misconduct

constituted "'unfairness as to make the resulting conviction a denial of due process.'"  *Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005), *quoting Darden*, 477 U.S. at 181.  The Court has instructed, "When specific guarantees of the Bill of Rights are involved, this Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them."  *Donnelly*, 416 U.S. at 643.  As in *Donnelly*,

> This is not a case in which the State has denied a defendant the benefit of a specific provision of the Bill of Rights, such as the right to counsel, *Argersinger v. Hamilton*, 407 U.S. 25 . . . (1972), or in which the prosecutor's remarks so prejudiced a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right.  *Griffin v. California*, 380 U.S. 609 . . . (1965). . . .
>
> But here the claim is only that a prosecutor's remark . . . so infected the trial with unfairness as to make the resulting conviction a denial of due process.

Here, the alleged comments by the prosecutor did not implicate any specific constitutional right of Baker.  As mentioned above, the prosecutor merely referred to evidence that was subsequently presented at trial and to inferences that could be drawn from that evidence.  This was not manipulation or misstatement of evidence.  Similarly, in *Darden*, the Court remarked:

> these comments . . . did not deprive petitioner of a fair trial.  The prosecutors' argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent. . . .  Much of the objectionable content was invited by or was responsive to the opening summation of the defense.

477 U.S. at 181-82 (footnote omitted).

Moreover, the comments came at the beginning of trial and the defense had ample opportunity to, and did, state its view of the relevance of the same evidence to the witnesses' credibility.  [RT 1092, 1102-03.]  Furthermore, the trial court gave "multiple and timely protective instructions" to the jury specifically

1    addressed to prevent misapplication of the attorneys' comments.  *Tan*, 313 F.3d at

2    1115; *see also Donnelly*, 416 U.S. at 645 (describing that the prosecutor's remark,

3    which was "admittedly an ambiguous one, was but one moment in an extended

4    trial and was followed by specific disapproving instructions").  These instructions

5    told the jury that they "must determine the facts from the evidence received in the

6    trial and not from any other source."  [RT 183.]  The jury was further advised that

7    "[s]tatements made by the attorneys during the trial are not evidence" and that, if

8    anything said by the attorneys conflicted with instructions, they must follow the

9    instructions.  [RT 184.]  Immediately preceding the prosecuting attorney's opening

10   statement, the jury was instructed as follows:

11          At this time, the lawyers will be permitted to make an opening
            statement if they choose to do so.  An opening statement is not
12          evidence, neither is it an argument.  Counsel are not permitted to
            argue the case at this point in the proceedings.  An opening statement
13          is simply an outline by counsel of what he or she believes or expects
            the evidence will show in this trial.  It's [sic] sole purpose is to assist
14          you in understanding the case as it is presented to you.

15   [RT 187.]  When petitioner's counsel objected to the prosecuting attorney's

16   comments, the trial court overruled the objection, but did admonish the

17   prosecuting attorney, before the jury, "Counsel is instructed to confine comments

18   to what the evidence will show."  [Aug. RT 4.]  Moreover, in response to defense

19   counsel's concerns, the trial court said that it would remind the jury of the court's

20   instructions on the consideration of the attorneys' comments during the

21   prosecution and defense opening statements.  [RT 190.]  Finally, the jury was

22   again instructed to decide the case on the evidence presented, and that "statements

23   made by the attorneys during the trial are not evidence," at the close of evidence

24   and before deliberations.  [RT 1123-25.]  It is presumed that the jury followed

25   these instructions.  *Tan*, 413 F.3d at 1115; *Drayden*, 232 F.3d at 713.

26

**IV.**

Baker also contends that the trial court erred in admitting two categories of evidence:  first, in admitting a tape recording of a conversation between defense investigator Pacheco and victim L.L.; and second, in admitting the contents of Baker's computer.

**A.**

One of Baker's accusers, victim L.L., had several conversations with defense investigator Chuck Pacheco.  One of these, apparently the last, was recorded by L.L.  In that taped conversation, Pacheco discussed the payment to L.L. of a bribe by petitioner's mother, Lettie Baker.  Baker argues that the admission into evidence of Joint Exhibit 2, the audiotape recording of that last conversation between L.L. and Pacheco, was erroneous for several reasons.  [Pet. at 27.]  Baker argues that the taped conversation was not relevant [Pet. at 31, 37-41]; that the probative value of the taped conversation was outweighed by its prejudicial effect [Pet. at 41]; that his right to confront the witnesses against him was violated [Pet. at 41-42, 44]; and that he was denied the right to counsel because witness tampering charges were filed against Pacheco, rendering Pacheco unable to assist with the investigation of the defense case [Pet. at 43-44].

Because the taped conversation between Pacheco and L.L. is the source of several separate challenges by Baker, I will set forth the background of this taped conversation, as well as its admission into evidence, in some detail.  I will then turn to consider Baker's legal arguments relating to admission of the taped conversation.

**1.**

After D.B. and C.F. reported having been molested by petitioner, both the defense and the District Attorney's office contacted C.F.'s sister, L.L.  [RT 670.]

At trial, L.L. testified as follows regarding her contact with Pacheco: When first contacted, L.L. did not disclose any molestation.  [RT 670-71.]  According to L.L., Pacheco was persistent in questioning her, and she finally told him that Baker had molested her.  [RT 671.]  Pacheco came to her house when she was not home and told her husband that Baker's parents wanted to buy a headstone for L.L.'s deceased infant son.  [RT 674.]

Before her next meeting with Pacheco, L.L. hid a tape recorder under her clothing. [RT 674; see CT 712-27.]  During that conversation, Pacheco appears to attempt to bribe L.L. to prevent her from testifying.  Pacheco tells L.L., "They said that they'd take care of you if the [inaudible] if you didn't testify."  [CT 729.] Pacheco continues, "if they have to pay $5,000 for a headstone for you to tell the truth that's what they want to do."  [CT 732.]  Pacheco states, "They have a lot of evidence against [Baker] on the other witnesses" [CT 733] and "[h]e's a piece [of] shit and [Baker's] gonna be paying for what he's done to you."  [CT 741.]

Pacheco appears to attempt to dissuade L.L. from testifying.  Pacheco describes the prosecutor as a "pit bull" [CT 730], and suggests that L.L. would not get any benefit from testifying against Baker [CT 738].  He tells L.L.: "let's just say he went to prison, say you get your piece [sic] of mind by testifying 20 minutes big fuckin deal.  What's that gonna do for you nothing really.  You know what happened in your heart and you know you could pray to god that [inaudible]. Something's going to happen to him.  So, . . . wouldn't it be smart to get what you need out of them[?]" [CT 738.]  L.L. responds, "You tell them I said 10 thousand dollars."  [CT 738.]  Pacheco told L.L. that she would need to sign a declaration, and she agrees.  [CT 738.]

Shortly before Baker's trial, the District Attorney filed charges against Pacheco based on the taped conversation.  [See RT 21.]  Baker sought dismissal of

the charges before trial, arguing that, by filing charges against Pacheco, the prosecution had interfered with his right to counsel and right to present a defense. [CT 316; CT 316; RT 18.]  Specifically, Baker complained that, as a result of the pending charges, Pacheco would invoke his Fifth Amendment rights and would not be able to testify at trial to impeach L.L.'s testimony.  [RT 21-22, 25, 28.] Moreover, Baker complained that he was deprived of the services of his investigator.  [RT 23.]

The trial court held that dismissal of the case was not warranted, and denied Baker's motion to dismiss.  [RT 32-33.]  The trial court observed that Pacheco likely would have invoked his Fifth Amendment rights based on the tape recording alone, regardless of any action taken by the District Attorney.  [RT 29.]  The trial court advised defense counsel that the prosecution had agreed to a continuance so that defense counsel could retain another investigator.  [RT 30.]  At a subsequent pretrial hearing, defense counsel told the court that he planned to take "the Court up on its offer" and requested a short continuance.  [RT 100.]

Baker presented his objection to admission of the taped conversation between Pacheco and L.L. by way of written motion in limine, filed on April 11, 2002.  [CT 327; Pet. at 32.]  That same day, the prosecution filed written motions in limine, including a motion "to admit testimony of threats and intimidation of victim [L.L.]."  [CT 345.]  The prosecution's motion referred not only to the bribery attempt, but also other attempts to dissuade L.L. from testifying.  The prosecution's motion argued "that the evidence of Pacheco's activities related to [L.L.'s] delay in reporting the molestations."  [Pet. at 33; CT 349-50.]

Ultimately, the tape was offered as a joint exhibit by both parties.  [RT 722.] The prosecution offered the tape as relevant to L.L.'s credibility.  [RT 722.]  The defense offered it to discredit L.L.'s testimony that Pacheco offered a bribe.  [RT

722-24, 732, 771-72.]  Baker's position was that the tape showed that it was

actually L.L. who suggested payment in return for favorable testimony.

[RT 722-24.]

There followed a lengthy discussion about redacting the tape recording and

accompanying transcript [RT 724-34, 769-84, 802-25], and about a stipulation and

special instructions to be read to the jury [RT 807-09, 823-84].  A redacted version

of the tape-recorded conversation between L.L. and Pacheco was admitted into

evidence as Joint Exhibit 2 [RT 1037] and was played for the jury during trial.

[RT 828; see CT 728-41; Pet. at 36; RT 723, 773, 804, 826.]

The jury was instructed that the tape was to be considered for a limited

purpose: "as circumstantial evidence of the state of mind of L.L. and as evidence

relevant to her credibility as a witness."  [RT 827.; CT 431; CALJIC 2.09]  Before

the redacted tape was played, the court instructed the jury as follows:

> All right, ladies and gentlemen, of the jury, you are about to
> hear portions of a tape-recorded conversation between a witness,
> [L.L.], and Charles Pacheco, an investigator for the defense.  This
> tape recording was prepared by [L.L.] as stated by her in her
> testimony in this trial.  You will not hear the entire recording because
> portions of it have been ruled inadmissible.
> The portions which you will hear are being admitted for a
> limited purpose.  The portion -- the limited purpose is that you may
> consider the statements of the tape recording as circumstantial
> evidence of the state of mind of [L.L.] and as evidence relevant to her
> credibility as a witness.  Other portions of the tape recording contain
> statements which are either consistent or inconsistent with the
> testimony [L.L.] gave in court.
> After the recording has been played, I will give you additional
> instructions regarding those statements.  This tape recording is a joint
> exhibit offered by both the prosecution and the defense.

[RT 826-27.]  The court also instructed the jury that the purpose of the transcript

was to assist them, and that the tape recording itself was the evidence.  [RT 827.]

Then the court read the stipulation that the parties had authored:

> The parties have stipulated that the opinions expressed by Mr.
> Pacheco on the tape are statements made by him to manipulate the

21

witness, [L.L.], and they have no factual basis whatsoever.  At the time of the taped conversation, it is stipulated that Mr. Pacheco had no knowledge of the facts of the case.

[RT 827-28.]

After the tape was played, the court read additional instructions:

All right, ladies and gentlemen.  The tape you just heard is hearsay evidence: and that means that unless there's some special exception, you are not permitted to receive that evidence for the truth of what is stated.
And as I instructed you previously, you may consider the statements in the tape recording as circumstantial evidence of the state of mind of [L.L.] and its [sic] evidence relevant to her credibility as a witness but not for the truth of what may be stated in those statements.
Now, there are several statements on the tape that are either consistent or inconsistent with her testimony when she testified as a witness for this trial.  And those statements are as follows:
"And if I tell the truth, they're not going to give me shit but heartache for the rest of my life because the truth of the matter is their son is a child molester.  Just walk down there and tell you what, Lettie, give me 10 grand and I will go away.  I will go away.  You tell them that.  You tell them I said $10,000 and a headstone.  I figure that's worth 8, 9, 10, 11, 12, 13, 14, that's worth seven years of him fucking me."
Those statements are either consistent or inconsistent with the testimony [L.L.] gave in court as a witness.  And those statements may be considered by you for the truth of what is stated therein.

[RT 828-29.]  The jury was later instructed that efforts by the defendant to suppress evidence may constitute evidence of consciousness of guilt.  [CT 431; CALJIC 2.06.]

**2.**

I will first consider Baker's challenge to the admission of the taped conversation.  [Ground 3 of the Petition.]  Baker submits that admission of the evidence was error for several reasons.  Baker argues that the taped conversation was not relevant because, among other things, "[p]etitioner was not directly implicated in the bribery scheme, and the jury was instructed that the tape could only be considered as to [L.L.]'s credibility and state of mind."  [Pet. at 31.]  He

refers to California Evidence Code section 785, which provides that: "[t]he credibility of a witness may be attacked or supported by any party, including the party calling him." [*See* Pet. at 38.]

Baker also argues that any probative value of this evidence was outweighed by its prejudicial effect. Baker asserts that admission of the tape was error because it "created an inference that petitioner was closely involved in a scheme to bribe one of the witnesses, and it contained derogatory comments by [L.L.] and Pacheco concerning petitioner. It certainly had no positive impact on the credibility of [L.L.], which was its only ostensible purpose." [Pet. at 31.] Further, he asserts, evidence of threatening or tampering with a witness is highly prejudicial because it implies a consciousness of guilt. [*Id.*, citing cases.]

Baker presented this claim on direct appeal. [LD 4 at 27-36.] The court of appeal responded:

> Here, the audiotape provided evidence that tended to support or detract from the credibility of the witness. . . . [T]he audiotape had a tendency in reason to explain why L.L. delayed reporting the crimes. From the prosecution's side, the audiotape tended to prove the absence of bias in L.L. because she rejected the attempt to provide her money in exchange for her false testimony. Further, it revealed that she expected repercussions from defendant's family for her testimony. From defendant's perspective, the tape tended to suggest a bias to the extent that L.L. set up the meeting and suggested the bribe in the first instance.

[LD 4 at 31.]

Insofar as Baker's argument invokes a question of relevance and the application of the California Rules of Evidence, it does not present a federal question. This court is "not a state supreme court of errors; we do not review questions of state evidence law. On federal habeas we may only consider whether the petitioner's conviction violated constitutional norms." *Jammal v. Van de*

*Kamp*, 926 F.2d 918, 919 (9th Cir. 1991); *see also Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986). In *Estelle v. McGuire*, the Court explained:

> In ruling that McGuire's due process rights were violated by the admission of the evidence, the Court of Appeals relied in part on its conclusion that the evidence was "incorrectly admitted . . . pursuant to California law." . . . Such an inquiry, however, is no part of a federal court's habeas review of a state conviction. We have stated many times that "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Pulley v. Harris*, 465 U.S. 37, 41 (1984). Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (per curiam).

502 U.S. 62, 67-68 (1991). I need not decide whether the tape was improperly admitted under the California Rules of Evidence because the writ of habeas corpus "is unavailable for alleged error in the interpretation or application of state law." *Middleton v. Cupp,* 768 F.2d 1083, 1085 (9th Cir. 1985). The writ "is not available when a petitioner merely alleges that something in the state proceedings was contrary to general notions of fairness or violated some federal procedural right unless the Constitution . . . protects against the alleged unfairness or guarantees the procedural right in state courts." *Middleton,* 768 F.2d at 1085-86.

Therefore, I consider only whether admission of the tape constituted a violation of Baker's rights to due process as guaranteed by the Fourteenth Amendment. *See id.* "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Dowling v. United States.,* 493 U.S. 342, 352 (1990). The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Id.* I will determine "whether the admission of the evidence so fatally infected the proceedings as to render them fundamentally unfair." *Jammal*, 926 F.2d at 919; *see also Kealohapauole*, 800 F.2d at 1465. I will review for any abrogation of

fundamental fairness in Baker's criminal trial.  *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967)  ("Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial . . ..  But it has never been thought that such cases establish this Court as a rule-making organ for the promulgation of state rules of criminal procedure" (citations omitted)).

Baker does not attempt to surmount this threshold for federal habeas relief. He presents no plausible argument linking a federal constitutional violation to the admission of the tape-recorded conversation as a matter of the law of evidence. With no constitutional violation stemming from the admission of this evidence against Baker, there is no basis for federal habeas relief.

Furthermore, the decision of the court of appeals regarding the relevance of this evidence was reasonable.  That court concluded that the taped conversation between L.L. and Pacheco was relevant and probative regarding L.L.'s credibility. In particular, the court of appeal pointed out that the tape would be relevant to her motive for coming forward with allegations of molestation so long after their alleged occurrence, and relevance regarding L.L.'s state of mind, given that she had initially denied any molestation and initially advised that co-accuser C.F.'s allegations of abuse were lies.  [RT 669-82.]  L.L.'s motivation for reporting abuse under these circumstances was an important issue of credibility properly submitted for resolution by the jury.

Baker also contends that the probative value of the evidence was outweighed by its prejudicial effect.  [Pet. at 41; Cal. Evid. Code § 352.]  Baker points out that in the tape, Pacheco calls him a "piece [of] shit" and promises L.L. that Baker was "gonna be paying for what he's done to [L.L.]."  [Pet. at 41; CT 741.]  Coming from his own investigator, Baker argues, "Pacheco's statements had

1  a prejudicial effect all out of proportion to any proper purpose of the recorded

2  conversation." [Pet. at 41.]

3       But, I would point out that Baker's argument that the relevance of this

4  evidence was outweighed by its prejudicial effect fails to present a federal

5  question insofar as it is based on an assertion of state law error.  Indeed, it will be

6  rare "that a state court's evaluative judgment - that the prejudicial effect does not

7  substantially outweigh the probative value" was so unreasonable "as to result in a

8  fundamentally unfair trial." *Kater v. Maloney*, 459 F.3d 56, 64 (1st Cir. 2006).

9       In addition, the court of appeal reasonably rejected this argument,

10  reasoning:

11       The trial court weighed the probative value of the audiotape against
        its prejudicial effect in this case.  It redacted portions of the tape after
12       an extended conference with the attorneys.  The court admitted only
        those parts of the tape that were relevant to L.L.'s state of mind and
13       provided enough explanation for the jury to allow them to
        intelligently evaluate this piece of evidence.  Further, the prejudicial
14       impact of these comments was diminished when the court instructed
        the jury "the [incriminating] opinions expressed by Mr. Pacheco on
15       the tape are statements made by him to manipulate the witness, [L.L.],
        and they have no factual basis whatsoever" and "Mr. Pacheco had no
16       knowledge of the facts of the case."  The trial court did not abuse its
        discretion.

17

18  [LD 4 at 33.]  Indeed, the trial court instructed the jury several times regarding the

19  relevance of the recorded conversation.  Importantly, the defense also offered that

20  conversation into evidence so as to indict the credibility of L.L., and certain of the

21  court's instructions regarding the taped conversation were the result of the parties'

22  stipulation.  [RT 827-28.]  Again, it is presumed that jurors follow the court's

23  instructions.  *Tan*, 413 F.3d at 1115.

24                                 **3.**

25       Not only does Baker dispute the relevance of the tape, but he also contends

26  that the "real problem with the tape . . . is that [it] is evidence of an out-of-court

statement, and therefore hearsay." [Pet. at 39.]  L.L.  "claimed that she was trying

to set up Chuck Pacheco, but Pacheco may have claimed that he was trying to set

her up, to see if she would initiate and follow through on a bribery proposal," but

Pacheco's arrest prevented him from becoming a witness.  [Pet. at 42.]   Baker

argues that, without Pacheco being present as a witness, "his out-of-court

statements were powerful prosecution [sic] evidence, without the safeguard of

confrontation and cross-examination."  [Pet. at 42.]

Baker asserts that admission of the tape recorded conversation between

Pacheco and L.L. constituted a violation of his federal constitutional right to

confront witnesses against him.  Baker asserts, "Pacheco was concurrently charged

with felony witness tampering and so was unavailable to testify, thus denying

petitioner confrontation concerning the context and meaning of his conversations

with [L.L.]."  [*Id.* at 31.]  Baker asserts that his confrontation rights were violated

because "the statement of a declarant, averring or inferring the guilt of the

accused, [was] introduced without the opportunity to confront and cross-examine

the declarant."  [*Id.* at 32, citing cases.]  Baker's denial-of-confrontation argument

relies on *Bruton v. United States*, 391 U.S. 123 (1968) and *Crawford v.*

*Washington*, 541 U.S. 36 (2004).

The court of appeal rejected Baker's denial-of-confrontation argument:

These cases [*Bruton* and *People v. Aranda*, 63 Cal. 2d 519 (1965)]
have no application here.  The audiotape is not a facially
incriminating confession of a codefendant that was admitted against
defendant.  Furthermore, because this evidence was not offered for
the truth of the matters asserted on the tape (as the jury was
instructed), there was no violation of defendant's confrontation rights.
[*Tennessee v. Street*, 471 U.S. 409, 414 (1985) (nonhearsay use of
codefendant's confession raised no confrontation clause concerns];
*People v. Carter* 30 Cal. 4th 1166, 1209 (2003).]

[LD 4 at 34.]

1      As set forth in a previous section, Baker's petition may be granted only if he

2  demonstrates that the state court decision denying relief "resulted in a decision

3  that was either (1) contrary to, or involved an unreasonable application of, clearly

4  established Federal law, as determined by the Supreme Court of the United States,

5  or (2) based on an unreasonable determination of the facts in light of the evidence

6  presented in the State court proceeding." *Cooke*, 606 F.3d at 1213, *citing Doody*

7  *v. Schriro*, 596 F.3d 620, 634 (9th Cir. 2010) (en banc).  I conclude that the court

8  of appeal's conclusion was neither contrary to, nor an unreasonable application of,

9  clearly established federal law as set forth by the Supreme Court.

10                          **a.**

11      In *Bruton*, the Supreme Court considered the prejudice occasioned when a

12  defendant and codefendant were jointly tried and convicted, and the codefendant's

13  confession was admitted and implicated the defendant.  This prejudice, the Court

14  held, rendered the defendant's trial unfair even though the trial court gave clear,

15  concise and understandable instructions that the confession could only be used

16  against the codefendant and must be disregarded with respect to the defendant.

17  *Bruton* is not similar to the present case.  As the court of appeal pointed out, the

18  tape recorded conversation was not "a facially incriminating confession of a

19  codefendant that was admitted against defendant." [LD 4 at 34.]   Furthermore, as

20  the court of appeal pointed out, the tape recorded conversation was admitted only

21  for the limited purpose of assessing L.L.'s credibility, and "this evidence was not

22  offered for the truth of the matters asserted on the tape."  [*Id.*]

23      With good reason, therefore, the court of appeal looked, instead, to

24  *Tennessee v. Street*, 471 U.S. 409 (1985), where the Court decided "whether

25  respondent's rights under the Confrontation Clause were violated by the

26  introduction of the confession of an accomplice for the nonhearsay purpose of

rebutting respondent's testimony that his own confession was coercively derived from the accomplice's statement." *Id*. at 410.  The Court observed that this issue was "significantly different" from the questions presented in *Ohio v. Roberts*, 448 U.S. 56 (1980), *Dutton v. Evans*, 400 U.S. 74 (1970), and *Bruton*, 391 U.S. 123. *Street*, 471 U.S. at 413.  In *Roberts* and *Dutton*, the Confrontation Clause issue arose because "hearsay evidence was admitted as substantive evidence against the defendants." *Id*.  In *Bruton*, "the Court considered whether a codefendant's confession, which was inadmissible hearsay as to Bruton, could be admitted into evidence accompanied by a limiting instruction." *Id*.  In *Street*, by contrast, the out-of-court confession was not offered to provide the truth of the matter asserted. There, the defendant argued that his confession was coerced by the sheriff, who read his accomplice's confession and demanded that Street likewise confess; in rebuttal, the prosecution offered the sheriff's testimony, who read the accomplice's confession to the jury.  The trial court instructed the jury that the evidence of the accomplice's confession was admissible for the purpose of rebuttal only. *Id*. at 412.  The Court held there was no constitutional violation, because the confession was admitted for the purpose of rebuttal only – this non-hearsay use "raise[d] no Confrontation Clause concerns." *Id*. at 414.

In this case, the taped conversation between Pacheco and L.L. was not offered for the truth of the matter asserted.  Instead, the taped conversation was offered only for the purpose of establishing L.L.'s state of mind in reporting (or delay in reporting) her allegations to have been molested by Baker.  Furthermore, the tape was offered as a joint exhibit, and Baker's counsel argued that the tape showed that L.L. had a motivation to lie and had indeed manufactured her allegations against Baker.  Finally, the trial court carefully instructed the jury about the role of the taped conversation and the purpose for which it may be

1 considered.  The trial court so instructed the jury both contemporaneous to the

2 tape being played to the jury, pursuant to instructions stipulated to by Baker's

3 counsel, and again at the close of the evidence.

4 **b.**

5 There is likewise no violation under *Crawford*.  Baker argues that the tape

6 recorded statement contained "testimonial material."  In *Crawford*, the Court held

7 that "the Framers would not have allowed admission of testimonial  statements of

8 a witness who did not appear at trial unless he was unavailable to testify, and the

9 defendant had had a prior opportunity for cross-examination."  541 U.S. at 53-54.

10 This holding applies to "'witnesses' against the accused – in other words, those

11 who 'bear testimony.'"  *Id*. at 51.  "Where testimonial statements are at issue, the

12 only indicium of reliability sufficient to satisfy constitutional demands is the one

13 the Constitution actually prescribes: confrontation."  *Id*. at 68-69.

14 The issue is therefore whether the taped conversation was "testimonial" in

15 nature.  In *Crawford*, the Court did not formulate a "comprehensive definition of

16 'testimonial.'"  *Id*. at 68.  The Court reasoned that "[w]hatever else the term

17 covers, it applies at a minimum to prior testimony at a preliminary hearing, before

18 a grand jury, or at a former trial; and to police interrogations."  *Id*.  The Court used

19 the term "interrogation" in its "colloquial" sense, not in the "technical legal" sense

20 used in other contexts such as Fifth Amendment analysis.  *Id*. at 53 n.4.

21 The court of appeal rejected Baker's argument regarding "testimonial

22 statements" pursuant to *Crawford*.  The court of appeal reasoned that:

23     Here, the tape of this meeting, made by L.L. without intervention by
the police, does not contain any testimonial statements.  The recorded

24     conversation is neither ex parte in-court testimony nor its functional
equivalent.  This recording was not an extrajudicial statement

25     contained in formalized testimonial materials or one made under the
circumstances that would lead an objective witness reasonably to

26     believe that the statement would be available for use at a later trial.

1

Thus, defendant's confrontation rights were not violated by the
admission of this evidence.

2

[LD 4 at 35.]

3

4

I conclude that *Crawford* is not implicated in this case.  The tape recorded

5

conversation between L.L. and Pacheco was not testimonial in nature.  L.L. was

6

present at trial.  Although Pacheco was not present at Baker's trial, his statements

7

are not the result of structured and authoritative questioning, such as those

8

concerned in *Crawford*.  Baker insists that this was "testimonial material" because

9

"the recording clearly contains substantive matters."  [Pet. at 44.]  But this

10

misstates the operative inquiry.  In sum, I conclude that there was no

11

Confrontation Clause violation.  The court of appeal's conclusion in this regard

12

was not contrary to or an unreasonable application of federal law.  In addition, the

13

state court did not apply that law to the facts of petitioner's case in an objectively

14

unreasonable manner.

15

**4.**

16

Pacheco was arrested about two days before Baker's trial was scheduled to

17

begin.  [RT 21, 25; LD 4 at 36.]  Baker asserts that the arrest of Pacheco, and his

18

subsequent unavailability, violated his right to the assistance of counsel.  Baker

19

contends that he was denied counsel "by the interruption of the defense

20

investigation."  [Pet. at 44.]

21

The parties discussed Pacheco's unavailability before trial.  Baker's trial

22

counsel argued that because Pacheco was arrested and subject to witness

23

tampering charges, Baker had been deprived his investigator's services.  [RT 23.]

24

The trial court advised Baker's counsel that the prosecution had agreed to a

25

continuance so that Baker could retain another investigator.  [RT 30.]  At a

26

subsequent pretrial hearing, defense counsel told the court that he was indeed

requesting a short continuance and, furthermore, that a one-week continuance would be adequate. [*Id*.] Baker's counsel declined the trial court's offer of a two-week continuance. [*Id*.] Counsel said, "Instead of asking for a two-week continuance, I'm going to ask the Court to indulge me in just a one-week continuance, and with the dark days that we talked about, would give – I believe, given the time of the jury selection, will give us time to get up to speed on this case." [RT 100.] This request was granted. [CT 392.] Presentation of evidence began on May 1, 2002, later than anticipated. [RT 102-03; CT 410.]

The court of appeal concluded that Baker procedurally defaulted this denial-of-counsel argument by requesting a continuance, and agreeing to a shorter continuance than that offered by the trial court. The court of appeal held that Baker waived this denial-of-counsel claim by not requesting another continuance or otherwise object to proceeding to trial:

> To the extent defendant argues the arrest of his investigator deprived his attorney of assistance in adequately preparing the case for trial, we reject this claim. In open court, the prosecutor proclaimed she would not object to a continuance, and the court stated it would look favorably on a continuance request to address this precise issue. Defense counsel obtained one short continuance. He never again asked for any additional time. This argument is forfeited.

[LD 4 at 36.] The California Supreme Court likewise denied this claim without comment. The decision of the court of appeal is thus the last reasoned decision on this issue.

In light of this background, I conclude that Baker's denial-of-counsel argument linked to Pacheco's unavailability was defaulted. A federal court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729

1    (1991) (internal quotation marks and citation omitted).  To constitute an

2    independent and adequate state law ground precluding federal review, the state

3    rule must be "firmly established and regularly followed state practice."  *Ford v.*

4    *Georgia*, 498 U.S. 411, 423-24 (1991); *see also Wells v. Maass,* 28 F.3d 1005,

5    1010 (9th Cir. 1994).  The California Supreme Court has repeatedly held that

6    constitutional objections, like other objections, must be interposed in order to

7    preserve them for appeal.  *In re Josue S.*, 72 Cal. App. 4th 168, 170 (1999)

8    (collecting cases).  The contemporaneous objection requirement constitutes an

9    independent and adequate state procedural ground.  *Ylst,* 501 U.S. at 806;

10   *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *Bonin v. Calderon,* 59 F.3d 815,

11   842-43 (9th Cir. 1995).  Because Baker defaulted this denial-of-counsel claim, it

12   cannot be considered here unless he shows both cause and prejudice for his

13   default.  *Coleman,* 501 U.S. at 750; *Murray v. Carrier,* 477 U.S. 478 (1986);

14   *Vansickel v. White,* 166 F.3d 953 (9th Cir. 1999).  Baker does not attempt to

15   establish cause and prejudice for his default.

16          Relatedly, Baker argues that he was deprived of his right to counsel by "the

17   one-sided use of the recorded conversation as prosecution evidence."  [Pet. at 44.]

18   The court of appeal concluded that this claim is refuted by the record:

19          We also reject defendant's claim the admission of the tape constituted
       a "one-sided use" of the tape.  At trial, this tape was jointly presented.
20       Both parties argued it supported their position: the prosecution argued
       the tape showed why L.L. reported the crime when she did.  The
21       defendant argued that L.L. could not be believed because she was the
       one who called Pacheco to set up the meeting and she was the one
22       who requested money not to testify.  The trial court did not abuse its
       discretion in admitting the audiotape at trial.

23

24   [Lod. Doc. 4 at 36.]

25          The court of appeal's determination was certainly reasonable.  As set forth

26   in detail above, Baker offered the tape recording into evidence.  [RT 722-24.]

Defense counsel did comment that he felt compelled to join in offering the tape because the prosecution was offering it as relevant to L.L.'s credibility. [RT 723-24.]  But choosing, as a matter of strategy, to introduce evidence that could both help and harm the defense case is not the same thing as raising an objection that the tape is inadmissible.

Moreover, in closing argument, Baker's counsel argued that the tape recorded conversation showed that L.L. had sought to extract a bribe from Baker's parents by threatening to change her testimony.  [RT 1099.]  Baker's counsel also pointed out that L.L. admitted making almost fifty phone calls to Pacheco before the taped conversation took place, and that L.L. arranged the meeting that she proceeded to tape surreptitiously.  [RT 1096-99, 1100-01.]  Baker's counsel reminded the jury that, according to the stipulation, all of Pacheco's negative statements about Baker were made to manipulate L.L.  [RT 1084, 1095.]  Defense counsel argued that L.L. delayed in taking the tape to the prosecution because she wanted to see if she would get money from Baker's parents.  [RT 1095-96.]

**5.**

Baker effectively repeats his arguments regarding Pacheco as his 9th ground in support of habeas relief.  [Pet. at 74.]  He additionally asserts in his 9th ground, however, that "Pacheco continues to be unavailable" and that this continued unavailability somehow constitutes "new evidence."  [*Id.* at 75.]

Baker claims there is new evidence that Pacheco was trying to "set [L.L.] up, to see if she would initiate and follow through on a bribery proposal."  [Pet. at 75.]  Baker presents the 2005 unsigned declaration of Michael Berghash, a paralegal.  [See Berghash decl., attached to Pet.]  Berghash declared that he had been unable to locate Pacheco "in spite of numerous attempts to do so."  Berghash states that Pacheco was sentenced in connection with his witness tampering

prosecution and then "took up another line of work, and disappeared from the area."  This is Baker's "new evidence": had Berghash been able to locate Pacheco, Baker believes that Pacheco would have contradicted the testimony of L.L. regarding the alleged bribe.  Berghash's belief is based on conversations allegedly occurring with other persons involved in Pacheco's defense.

Baker presented this claim to the state superior court as a claim of newly discovered evidence that supported state habeas relief.  The superior court found:

> Petitioner claims that Mr. Pacheco remains unavailable, that his case is resolved and that he may have been arrested in another jurisdiction in February, 2005.  Due to this continuing unavailability, petitioner contends Mr. Pacheco should be subpoenaed for purposes of this habeas petition.  However, he fails to attach an affidavit from Mr. Pacheco setting forth testimony that is reasonably probable to have made a difference in the outcome of the trial.  Although obtaining such an affidavit may be problematic without a subpoena, the law remains clear that it is petitioner's burden to set forth a prima facie case for relief (*In re Bower* (1985) 38 Cal.3d 865).  Absent a showing of Mr. Pacheco's probable testimony, petitioner is not entitled to discovery until after an order to show cause has been issued (*In re Scott* (2003) 29 Cal.4th 783).  This court will not issue an order to show cause allowing petitioner to attempt to serve a subpoena on a witness whose whereabouts are unknown.  Petitioner admits he is unaware of Mr. Pacheco's location and attaches affidavits from habeas counsel and counsel's paralegal confirming the whereabouts of Mr. Pacheco remain unknown.  Even if Mr. Pacheco's whereabouts were known to petitioner and this court, petitioner fails to establish a reasonable probability that Mr. Pacheco would give a statement that would warrant habeas corpus relief in this case.  A tape recording of Mr. Pacheco attempting to bribe L.L. and/or influence her testimony was introduced into evidence at trial with instructions to the jury that they could consider it for a non-hearsay purpose.  Petitioner's right to confrontation was never violated, as confrontation applies only to hearsay, and the matter was not introduced as hearsay (*see Crawford v. Washington* (2004) 541 U.S. 36).  This evidence was relevant to the credibility of L.L., and Mr. Pacheco is not likely to give a statement that would believably show otherwise.  Petitioner offers no anticipated statement by Mr. Pacheco relevant to any issue in the case.

[LD 9 at 4-5.]  The superior court's decision, as stated above, is the last reasoned state court decision on this issue.

The Court of Appeals for the Ninth Circuit has recognized that habeas relief may be granted where a defendant introduces affirmative proof of actual innocence based on newly discovered evidence. *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc); *see also Herrera v. Collins*, 506 U.S. 390, 400 (1993). Petitioner has never raised a claim of "actual innocence" and Petitioner's proffered "new evidence" falls well short of substantiating any such claim. As the superior court's decision shows, Baker failed to develop the factual basis of such a claim in state court and is not entitled to an evidentiary hearing in federal court on this claim. *Earp v. Ornoski*, 431 F.3d 1158, 1167 (9th Cir. 2005). Baker never presented a declaration or affidavit from Pacheco; although Baker claims that Pacheco cannot be located, he did not present declarations of the "other persons involved in Mr. Pacheco's defense" regarding what evidence he might have possessed. In the time since the superior court found this showing inadequate, Baker has apparently made no further attempts to develop the factual basis of this claim. [*See* LD 12, 14.] In any event, this claim is spurious. Berghash's declaration discloses that Pacheco was sentenced, and so necessarily convicted, of witness tampering. [Berghash Decl. at 2.] Pacheco could not have contradicted L.L.

## B.

Pursuant to a search warrant issued after Baker's arrest, law enforcement personnel searched his home and seized a computer from his bedroom. The hard drive of the computer was accessed and revealed that the computer had been used to access a number of pornographic websites. [RT 447.] Pornography was extracted from Baker's computer and admitted into evidence against him. Baker asserts that it was error to admit the contents of his computer into evidence because he did not have sole access to it (Ground 4 of the Petition). [RT 1018.]

He asserts that his access to and control over the computer was a foundational

matter, which the prosecution was required to prove, under California Evidence

Code section 403.

　　　To begin consideration of this claim, I will provide background regarding

the seizure and search of Baker's home computer.  On December 12, 2000,

Baker's house was searched.  [RT 431.]  Officers seized three computers,

including the one in Baker's bedroom.  [RT 437.]  Deputy Sheriff Damien Frisby,

part of the Sacramento Valley High-Tech Crimes Task Force, analyzed the

computers.  [RT 110.]  One of them, a Hewlett-Packard, appeared to be used by

Baker, in that his name appeared on documents and as a user name.  [RT 112.]

Frisby found that many pornographic images, including images of very young

girls, had been accessed on this computer.  [RT 112-13, 119-20, 126-28.]  The

prosecution sought to introduce this evidence to corroborate D.B.'s anticipated

testimony about Baker showing her pornography, including images of young girls

and bestiality, on his computer and as evidence of his interest in young girls.  [RT

149, 152.]  Baker filed a motion in limine to exclude the sexually explicit images

from evidence.  [CT 328.]  Primarily, he argued that the evidence was more

prejudicial than probative, and should therefore be excluded under California

Evidence Code section 352.  [CT 328-32; *see* RT 50.]  In his motion, he also

alleged that "numerous other parties have had access to the computer from which

said images were accessed . . . ."  [CT 329.]  A hearing was held, pursuant to

California Evidence Code section 402, on the admissibility of the evidence.  [RT

53, 106-47.]  After hearing the testimony of Frisby [RT 108- 43] and the

arguments of counsel [RT 148-54], the trial court ruled that the images could be

introduced into evidence.  [RT 154-55.]

1    Accordingly, Frisby testified at trial about examining the information stored

2  on Baker's computer.  [RT 442.]  Frisby testified that he found that many

3  pornographic websites, including some featuring young girls, had been accessed

4  through Baker's computer.  [RT 447-48.]  There were also digital photographs that

5  appeared to have been made by a digital camera.  [RT 447.]  Frisby also found that

6  about 1,500 files had been deleted from October 23 through October 27, 2000 [RT

7  452-54], which was around the time D.B. reported domestic abuse and Baker

8  threw her out of the house.  [RT 200, 357.]  A collection of images found on the

9  computer was entered into evidence as People's Exhibit 1.  [RT 454.]  Further,

10  additional evidence regarding Baker's access to the computer was admitted at trial.

11  Frisby testified that he found Baker's name on documents and as user names on

12  the same computer on which the pornographic images and websites were found.

13  [RT 446.]  He found documents relating to Baker's wife, Dharma, on a different

14  computer.  [RT 446-47.]  D.B. testified that Baker and Dharma each had their own

15  computer, and that only Baker used his.  [RT 230, 330.]  Julian, Dharma's son,

16  also testified that he was not allowed to use Baker's computer.  [RT 424-25.]

17  Baker and Dharma, on the other hand, testified that the children had access to and

18  used Baker's computer.  [RT 898, 956.]  Baker testified that he did not use a

19  password.  [RT 952.]

20    In his direct appeal, Baker argued that the prosecution failed to establish an

21  evidentiary foundation for introduction of evidence found on his computer, such

22  as the large number of pornographic photographs.  [LD 1 at 52.]  The court of

23  appeal rejected Baker's claim.  The court of appeal stated that this evidence was

24  relevant: "this evidence was offered both as evidence of the crimes defendant

25  committed at the time he showed pornographic images to D.B. and also as

26  evidence of defendant's deviant sexual intent and interest in young girls."  [LD 4

at 37.]  The court of appeal also concluded that the prosecution had met its burden

of establishing a foundation for the admission of this evidence:

> Here, the trial court held a hearing pursuant to [California] Evidence
> Code section 402 prior to trial.  At that hearing, Deputy Frisby
> testified that he found documents and user names on the accounts
> used for Internet access that showed defendant used one of the
> computers.  On that computer, Deputy Frisby also located the
> pornographic image files admitted at trial.  Deputy Frisby also located
> a number of Internet cookies on that computer that showed the user of
> this computer accessed a number of adult pornographic sites.  The
> cookie file names all started with "randybaker@www.[Web site
> name]."  The People also made an offer of proof that D.B. observed
> computer pornography in defendant's bedroom.  At trial, Deputy
> Frisby repeated his conclusions about the connection between
> defendant and the computer.  Both D.B. and her brother testified
> defendant showed them pornographic images on the computer similar
> to the ones defendant had in the "Framing Fabrics" book.  Defendant
> admitted he was the primary user of this computer.  This evidence
> was sufficient for the jury to conclude that defendant accessed these
> images on the Internet, downloaded them to his computer, and
> showed D.B. pornographic images similar to the ones presented to the
> jury. The trial court did not abuse its discretion in admitting this
> evidence.

[LD 4 at 39-40.]

Baker did not present a federal constitutional claim to the state court.  [LD 1

at 52-55.]   Baker argued only, instead, that the prosecution failed to establish a

foundation for the admission of the evidence in question.  A federal court does not

interfere with a state evidentiary ruling unless the evidence was so prejudicial that

its admission or exclusion violated fundamental due process and the right to a fair

trial.  *McGuire*, 502 U.S. at 67-68; *Jammal*, 926 F.2d at 919-20.  As with Baker's

other claims of error in the admission of evidence, he had failed to identify a

federal constitutional violation.  In fact, Baker acknowledges that "[t]here is no

known authority concerning the foundational requirements for possession of

deleted materials from a computer hard drive . . .."  [Pet. at 48.]  Again, therefore,

this claim does not present any cognizable issue for federal habeas review.  This is

1    at most a claim of trial court error in applying state law.  Federal habeas relief is

2    only available to a prisoner in custody in violation of the United States

3    Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a);

4    *McGuire*, 502 U.S. at 68.  Baker must establish that the asserted lack of foundation

5    "rendered the trial . . . arbitrary and fundamentally unfair . . . ."  *Jammal*, 926 F.2d

6    at 920.  Baker has not done so.

7          On direct appeal to the court of appeal and in this court, petitioner cited

8    *Guam v. Shymanovitz*, 157 F.3d 1154 (9th Cir. 1998).  [Pet. at 50; LD 1 at 55.]  In

9    his petition, Baker argues that the issue of "whether and when the contents of a

10   computer hard drive, accessible by several persons, may be admitted against the

11   defendant who was the owner of the computer" was then pending before the Ninth

12   Circuit en banc, in *United States v. Curtin*, 489 F.3d 935 (9th Cir. 2007).  But the

13   Ninth Circuit's en banc decision in *Curtin* has no application to this case.  *Curtin*

14   was a direct appeal, raising a question regarding the interpretation of Federal Rule

15   of Evidence 404(b).  *Curtin* did not deal with the issue that Baker presented to the

16   court of appeal and again presents here: the foundation required to establish a

17   threshold connection between the sexually explicit material and a criminal

18   defendant.  In addition, *Curtin* rejected the proposition that the First Amendment

19   required a blanket exclusion on evidence of the possession of "lawful reading

20   material" being presented as "other crimes, wrongs, or acts" that may

21   be admissible for a limited purpose under Rule 404(b) of the Federal Rules of

22   Evidence.  489 F.3d at 953-56.

23         This claim based on an alleged lack of evidentiary foundation presents no

24   federal claim for review.  In any event, the state court's rejection of this claim was

25   not contrary to, or an unreasonable application of, federal law because it did not

26   contradict the controlling law as decided by the Supreme Court.  As well, the state

court did not apply that law to the facts of Baker's case in an objectively unreasonable manner.

## V.

Baker argues that his trial counsel was ineffective in several respects: In delivering his opening statement (Ground 2 of the Petition), in failing to present expert testimony regarding the contents of his computer (Ground 5 of the Petition), and in failing to present evidence undermining the credibility of the victim's testimony (Ground 7 of the Petition).

Baker's claims of ineffective assistance of counsel are evaluated according to the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). First, Baker must show that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 669.  Second, Baker must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  *Strickland* recognized that "[j]udicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689.  In addition, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*.

## A.

1    Baker asserts that he received ineffective assistance of counsel because his

2    attorney, in his opening statement, "undertook to prove petitioner's

3    innocence,"and  and invited the jury to hold him to a "vigorous standard." [Pet. at

4    27.] Baker  argues that his counsel "promised much more than he could

5    reasonably expect to deliver" and that "it was foolhardy for the defense to assume

6    the burden of proof." [Pet. at 29-30.] Baker states that ineffective assistance may

7    occur when counsel concedes a critical element of an offense, or during closing

8    argument. [Pet. at 28.] *See Gentry v. Roe*, 300 F.3d 1007 (9th Cir. 2002); *see also*

9    *Chapman v. Cal.*, 386 U.S. 18 (1967). [*See also* Pet. at 29, citing cases.]

10    This argument was presented in a new trial motion to the trial court.  The

11    trial court rejected this argument, concluding that offering to prove facts was "a

12    valid strategic approach that is not uncommonly used by qualified counsel." The

13    trial court also found that: "Any prejudice resulting from this approach was cured

14    by the court's instructions regarding the burden of proof." [CT 644.]  Baker also

15    presented this claim to the court of appeal, which likewise rejected it. [LD 4 at 19-

16    23.] The court of appeal pointed out that the record of the new trial motion did not

17    disclose defense counsel's reasoning for assuming such a burden during opening

18    argument. [LD 4 at 21.]  The court of appeal also concluded, however, that

19    counsel's performance was not deficient. [LD 4 at 21.]  The court of appeal found

20    that counsel made a valid strategic decision:

21        Here, counsel made a tactical decision to tell the jury, although he had
          nothing to prove, that he was going to prove the defendant was
22        innocent, the victims' allegations were false, and these victims had
          ulterior motives.  We agree with the trial court's assessment in
23        denying defendant's new trial motion that defendant's opening
          statement was a "valid strategic approach that is not uncommonly
24        used by qualified counsel."

25    [LD 4 at 22.]  The court of appeal further found that trial counsel did in fact

26    "deliver[] on what he promised" in the opening remarks by cross-examining the

victims, bringing out their inconsistent and false statements.  Defense counsel presented evidence that both D.B. and C.F. had made past false allegations of molestation and abuse.  He presented evidence that D.B. had a motive for leaving her father's home and making a false accusation.  Baker presented his own testimony to refute the charges and support for his testimony from his wife and others.  [LD 4 at 22.]  Finally, the court of appeal held that Baker had failed to demonstrate prejudice.  [LD 4 at 22.]  The court said, "The trial court correctly instructed the jury on the respective burdens of proof of each party in the action.  As the trial court concluded, 'Any prejudice resulting from this approach was cured by the court's instructions regarding the burden of proof.'"  [LD 4 at 23.]  Finally, Baker presented this ineffective assistance of counsel claim in his petition for review to the California Supreme Court [LD 6 at 7-11], which denied his claim without comment.  [LD 7.]  The decision of the court of appeal is therefore the last reasoned decision of the state court regarding this claim, and my review is directed accordingly to it.

I conclude that Baker has failed to demonstrate that he received constitutionally ineffective assistance of counsel on the basis of his trial counsel's opening statement.  Baker meets neither prong of the *Strickland* test.

**1.**

First, I conclude that Baker has not shown that his trial counsel's performance fell below an objective standard of reasonableness.  I begin by reviewing the statement at issue in context, and observe that Baker's claim loses much of its force when the comment at issue is viewed in context.  During opening statements, Baker's counsel told the jury:

> We'll prove to you a number of things.  And I'm going to address for you the facts in this case.  I'm not going to talk about saints and angels.  I'm not going to talk about trailer trash.  I'm not

going to talk about the defendant being, quote, "pissed off," end quote. I'm going to talk about the facts, . . . and the facts that we will prove in the prosecution's case in chief in proving the defendant's innocence of this case.

     And I'm going to hold you, and I want you to hold me to a vigorous standard in this case. We have nothing to prove, but we will prove through the prosecution witnesses, and we will prove through the defense witnesses, including the defendant, that all these allegations are false; that there was a motivation by all three alleged victims. And I'm going to say alleged victims, alleged victims and alleged victims over and over again. And that they all had a separate agenda for making these false allegations. Some of that you have already heard from the District Attorney. Some of that agenda was provided in her opening statement.

[Aug. RT 20-21.]  Although Baker highlights the statement by his counsel to the

effect that "I want you to hold me to a vigorous standard in this case," in the very

next sentence, Baker's counsel reminded the jury that the defense was not required

to prove anything.

     As the court of appeal pointed out, trial counsel sought to fulfill his promise

in his opening statement – he secured testimony through examination of defense

witnesses – to the effect that each of the three accusers had motives to make false

allegations. For example, Baker's wife testified that accuser D.B. was a troubled

child, who had academic and behavioral problems, and who was prone to lie and

make false accusations. [RT 850-58, 869-70, 899-900.]  Baker's trial counsel also

elicited testimony on cross-examination of the prosecution witnesses that indicted

the credibility of the accusers. For example, he elicited testimony from D.B.'s

mother that D.B. had made false accusations of molestation against other

individuals. [RT 384-89, 605-07.]  Baker's trial counsel was able to argue,

plausibly, that each victim had a motive to lie. [RT 1086, 1092, 1095, 1098-99,

1104-04.]

     This was not ineffective assistance. To show deficient performance, Baker

must overcome a presumption that counsel's actions were part of sound trial

strategy. *Strickland*, 466 U.S. at 689-90; *accord Bell v. Cone*, 535 U.S. 685, 698, 702 (2002). "[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998). The court of appeal reasonably concluded that defense counsel's opening statement was a reasonable strategic decision in light of the facts at hand.

## 2.

Second, Baker failed to show that he was prejudiced by the performance of his counsel. Even if trial counsel's opening statement were deemed an error, Baker must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694. But Baker does not show how he was prejudiced by trial counsel's opening statement. He baldly asserts, without support, that counsel's "failure to deliver as promised had a predictable and disastrous effect on the defense case." [Pet. at 30.] In any event, the jury was correctly advised of the burden of proof; the burden of proof was correctly stated by the prosecutor and by Baker's counsel. [RT 1072, 1084.]

The trial judge instructed the jury, moreover, that the attorney's statements in opening remarks were not the law: "You must accept and follow the law as I state it to you whether or not you agree with the law. If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions." [RT 183-84, 1124; CT 428 (CALJIC No. 1.00).] Importantly, the jury was instructed correctly regarding the burden of proof, as reflected in the trial judge's charge to the jury, which instructed:

A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.  Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.

[CT 434 [CALJIC No. 2.90].]  As set forth previously, it is presumed that jurors follow the court's instructions.  *See Hovey v. Ayers*, 458 F.3d 892, 913 (9th Cir. 2006), *citing Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).

### B.

The prosecution offered a qualified expert in the field of computer science to testify regarding the significance of the thumbnail images found on Baker's computer hard drive.  The expert, El Dorado County Deputy Sheriff Damian Frisby, had been assigned to a computer-crimes task force for four years and had been qualified as an expert witness on four prior occasions.  In contrast, Baker points out, "defense counsel used petitioner's own testimony in an effort to establish that the images were accessed . . . by an automatic search engine."  [Pet. at 51.]  Baker points out that the jury was instructed to consider the bias, interest or other motive of a witness in evaluating his or her credibility [CT 432, CALJIC 2.20], and that the jury was instructed to consider the qualifications of an expert witness in considering the weight to be given to the expert's testimony [CT 434-35, CALJIC 2.80.]  Baker appears to repeat effectively the same allegations as his eighth ground for relief.  [Pet. at 69.]

Baker contends that his trial counsel was ineffective because counsel allowed Baker to act as his own computer expert at trial, while the prosecution offered the testimony of a qualified expert witness.  Baker argues that the

performance of his counsel passes the standard enunciated in *Strickland*, because: (1) his counsel's performance fell below an objective standard of reasonableness; and (2) he was prejudiced by counsel's errors, i.e., "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 693-94 (a reasonable probability is a "probability sufficient to undermine confidence in the outcome").

**1.**

To begin with the background of Baker's claim, Frisby testified for the prosecution as an expert witness.  [RT 442-44.]  He analyzed the information stored on the hard drive of Baker's computer and found that websites featuring sexually explicit pictures of young girls had been accessed on that computer via the Internet.  [RT 444-49.]  Most of the images were small "thumbnail" images and banners, used for advertising.  [RT 448, 451.]  In Frisby's opinion, websites featuring child pornography did not simply "pop up" on a computer screen like other websites; in fact they were hard to find.  [RT 450, 456-57.]  Most of these images had been deleted, but were still on the hard drive and listed in the Internet cache directory.  [RT 451- 52.]  Frisby could not say whether they had been manually deleted or automatically deleted by a computer program.  [RT 452.]  On cross-examination, Frisby acknowledged that when a person views a pornography site on the Internet, other pornography sites will quickly "pop up" or appear on the computer screen, with thumbnail images and advertisements for other sites. [RT 467.]  He acknowledged that Baker's computer had a "Nuts and Bolts" program that could be used to delete files.  [RT 473.]  He acknowledged that the names of websites, such as names including "Lolita," might suggest that they are child pornography sites, but that they might not actually contain child pornography.  [RT 478.]

1    Baker testified that he had expertise in using a computer. [RT 945.] He

2    testified that he used a program called "Site Snag" that he would send to a web

3    address to gather the information from a website and any linked websites.

4    [RT 946.] According to Baker, this was how the thumbnails and banners from

5    child pornography or putative child pornography sites had gotten onto his hard

6    drive. [RT 946.] Thumbnails, Baker testified, are only advertisements for a pay

7    website. [RT 953.] He testified that he had not viewed any of the images of

8    young girls; if he had, the full size picture (*i.e.* not only the thumbnail image)

9    would be on his hard drive. [RT 950-51.] Baker testified that he had regularly

10   deleted his entire cache about once a week. [RT 947.]

11   The state courts rejected this claim of Baker's ineffective assistance of

12   counsel. This issue was raised in his motion for a new trial. The trial court denied

13   that motion, concluding that the failure to engage a defense expert was "a strategic

14   choice based upon a thorough pre-trial evaluation of the People's expert witness."

15   Further, the trial court reasoned, "[c]ross-examination of this expert by defense

16   counsel resulted in testimony favorable to the defense theory of the case.

17   Accordingly, the standard of care did not require an opposing expert to be called."

18   [CT 644.] On direct appeal, the court of appeal rejected Baker's argument as well.

19   [LD 4 at 23-27.] The court of appeal concluded that: "On the merits, defendant

20   has failed to demonstrate counsel's conduct fell below an objective standard of

21   reasonableness;" instead, "[d]efendant argues nothing more than the use of the

22   defendant has drawbacks and his reliance on the cross-examination of the

23   prosecution's witness was flawed. This is not enough." [LD 4 at 26.] Further, the

24   court of appeal held that Baker could not demonstrate prejudice because these

25   facts were relatively unimportant "in the larger context of this case." Defense

26   counsel could reasonably decide that this issue should not be a focus of attention:

"Objectively, the testimony of the victims and the photographs of C.F. were among the items of evidence that was far more devastating than the deleted thumbnail photographs on defendant's computer. Defense counsel's conclusion the state of the evidence on this lesser point was sufficient so that a separate retained expert witness was not required did not fall below the objective standard of care." [LD 4 at 26-27.] Baker renewed this claim in his petition for writ of habeas corpus filed in the Sacramento County Superior Court on December 2, 2005. [LD 8 at 31-35.] The superior court pointed out that the claim had been raised and rejected on direct appeal. [Lod. Doc. 9 at 3.]

> Everything petitioner offers in support of this petition is included in the appellate record, and was analyzed extensively on appeal. Petitioner offers nothing new in this petition. Indeed, petitioner is attempting a <u>third</u> review of this issue after raising it in a motion for new trial and on appeal. In denying the motion for new trial, the trial court considered petitioner's identical contentions on the same facts and specifically found that petitioner's counsel had made a competent strategic choice in using petitioner as his computer expert. This finding was affirmed on appeal and Petition to [t]he California Supreme Court was denied. . . . Assuming [*In re*] *Robbins* [18 Cal. 4th 770 (1998)] permits a claim of ineffective assistance in this petition, the record provides no basis to reach a different conclusion than that expressed in the decision of the Third District Court of Appeal in rejecting the claim on its merits. Petitioner was afforded a full opportunity to raise and argue the claim in the trial court and on appeal, and presents nothing new in this petition that compels a different result. For example, he offers no affidavit from an independent expert setting forth findings, opinions and conclusions that were reasonably likely to have led to a verdict more favorable to defendant.

[LD 9 at 3-4.] As the decision of the superior court incorporates and reiterates the opinion of the court of appeal, I again look to the court of appeal's decision as the last reasoned decision of the state courts.

**2.**

1    For this claim to provide a basis for federal habeas relief, Baker must show

2  both that counsel's actions fell below an objective standard of reasonableness and

3  that the alleged errors resulted in prejudice.  *Strickland*, 466 U.S. at 687-88.

4    Baker cannot succeed on the first component because he does not overcome

5  the "strong presumption" that his trial counsel's performance fell within the "wide

6  range of reasonable professional assistance."  *Id*. at 689-90; *see also Babbitt v.

7  Calderon*, 151 F.3d 1170, 1173-74 (9th Cir. 1998).  The issue is not what defense

8  counsel could have done, but whether the choices made were reasonable.

9  *Strickland*, 466 U.S. at 690; *Siripongs*, 133 F.3d at 736.  Baker does not explain

10 the reason for trial counsel's choices.  Baker does not even explain what the

11 hypothetical expert's testimony would or could have been, or how it would have

12 been helpful, or how it would have been different than Baker's own testimony.

13 *See Villafuerte v. Stewart*, 111 F.3d 616, 630 (9th Cir. 1997); *United States v.

14 Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987).  Baker's claim remains, as it was in

15 the state courts, "wholly speculative."  *Hopkinson v. Shillinger*, 866 F.2d 1185,

16 1212 (10th Cir. 1989).

17    The court of appeal reasonably concluded that the decision by Baker's trial

18 counsel *not* to present an expert witness on computer matters falls within the range

19 of "reasonable professional judgment."  *Strickland*, 466 U.S. at 689-90; *accord

20 Bell*, 535 U.S. at 702; *see also Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005)

21 ("Courts applying *Strickland* are especially deferential to defense attorneys'

22 decisions concerning which witnesses to put before the jury").  As can be seen

23 from the above summary, Frisby's testimony was fairly consistent with Baker's

24 testimony.  Frisby's testimony did not establish that the images found on Baker's

25 computer had been deliberately accessed, viewed, or manually deleted.

26

1    In addition, even if it could be said that trial counsel committed a serious

2   error, Baker has failed to prove prejudice.  *Strickland*, 466 U.S. at 691-93.  To

3   reiterate, Baker "must show that there is a reasonable probability that, but for

4   counsel's unprofessional errors, the result of the proceeding would have been

5   different.  A reasonable probability is a probability sufficient to undermine

6   confidence in the outcome." *Id.* at 694.  Baker criticizes his own testimony about

7   his computer as biased and unqualified.  [Pet. at 54.]  But, as already described,

8   Baker has never set forth what an independent expert's testimony would have

9   been, how it would have been helpful, or how it would have been different from

10  his own testimony.  *See Villafuerte,* 111 F.3d at 630; *Berry,* 814 F.2d at 1409.  In

11  any event, Baker was shown to possess other, even more disturbing images, than

12  those found on his computer.  Baker possessed photographs of C.F., underage,

13  unclothed, and in sexually suggestive poses, among other sexually explicit

14  photographs in a book disguised as a welding manual.  [LD 4 at 7-8, 27; RT 239,

15  435, 567-68.]  The court of appeal found that "[o]bjectively, the testimony of the

16  victims and the photographs of C.F. were among the items of evidence that was far

17  more devastating than the deleted thumbnail photographs on defendant's

18  computer." [LD. 4 at 26-27.]

19                                    **3.**

20     In ground eight of his petition, Baker asserts that the superior court erred by

21  failing to hold an evidentiary hearing regarding his state habeas petition.  [Pet. at

22  73.]  This claim is not persuasive.  It was Baker's burden to set forth a prima facie

23  case for state habeas relief.  *People v. Romero*, 8 Cal. 4th 728, 737 (1994).  Under

24  California law:

25          The petition should both (i) state fully and with particularity the facts
            on which relief is sought . . . as well as (ii) include copies of
26          reasonably available documentary evidence supporting the claim,

1   including pertinent portions of trial transcripts and affidavits or
2   declarations. . . . "Conclusory allegations made without any
    explanation of the basis for the allegations do not warrant relief, let
3   alone an evidentiary hearing." . . . We presume the regularity of
    proceedings that resulted in a final judgment, . . . and, as stated above,
    the burden is on the petitioner to establish grounds for his release.

*People v. Duvall*, 9 Cal. 4th 464, 474 (1995) (citations omitted).  "If no prima

facie case for relief is stated, the court will summarily deny the petition." *Id*.

Baker failed to present documentary evidence such as affidavits or declarations

from trial counsel and an independent expert, and was accordingly rejected by the

superior court without a hearing.

## C.

Baker argues that his counsel was ineffective in failing to challenge the

testimony of prosecution witnesses, and in failing to corroborate defense witness

testimony.  Baker pointed to six instances in which he claims that counsel was

ineffective in this regard.  [Pet. at 64-67.]  The state courts rejected these claims as

devoid of factual support, and I agree.  In evaluating the effectiveness of Baker's

trial counsel, I once more apply the *Strickland* standard.  466 U.S. at 687-88; *see*

*also Williams*, 529 U.S. at 391.

## 1.

While cross-examining accuser D.B., defense counsel asked her whether she

had been accused of stabbing her mother in 1998.  D.B. denied stabbing her

mother.  Defense counsel did not produce any document or police report to

substantiate the question, however, and there was no other evidence supporting the

accusation.  [*See* RT 1092, RT 346-46.]  In argument, trial counsel commented on

D.B.'s look of incredulousness when he had questioned her about the stabbing.

[RT 1092.]  Trial counsel said, "I don't make this stuff up, folks.  It's in reports."

[RT 1092.]  Baker asserts that trial counsel should have produced a report that

would have discredited D.B.'s testimony and substantiated his argument that "[i]t's in reports."  Baker argues that his attorney's failure adequately to investigate and introduce evidence constitutes deficient performance, *citing Avila v. Galaza*, 297 F.3d 911 (9th Cir. 2002).  [Pet. at 65.]

The incident brought up by defense counsel was a fight between D.B. and her mother, Joanne B., that resulted in Joanne being taken to jail.  [RT 278.]  D.B. testified that she had initiated the fight and that Joanne had retaliated by scratching her.  [RT 278-79.]  Defense counsel asked if D.B. had "stabbed" her mother, and D.B. said, "No."  [RT 279-80.]  On redirect, the prosecutor asked D.B. some follow up questions, in which D.B. explained that she was using a knife to make a sandwich when the fight began.  [RT 329.]  At one point, D.B. testified that Joanne had said, "What? Are you going to stab me?" and had grabbed the blade of the knife.  [RT 329.]  According to D.B., this was why she had denied stabbing her mother earlier in cross-examination.  [RT 329-30.]  Joanne testified that D.B. had not lied about this altercation.  [RT 346.]  Baker testified regarding his recollection of the incident, which was different than that of Joanne and D.B., although he was not present during the altercation.

Baker raised this claim in a petition for writ of habeas corpus filed in the superior court.  That court denied the claim on the basis that Baker had failed "to attach the reasonably available trial transcript to support this claim."  The superior court also denied the claim on the merits, stating:

> [r]egardless, the petition fails in any event, as petitioner has not established prejudice.  D.B. provided specific details in her testimony regarding the crimes charged.  This testimony was corroborated by the testimony of the other two victims and documentary evidence that was clearly persuasive to the jury.  Further, D.B. admitted on cross-examination that she was manipulative and a good, habitual liar, and defense trial counsel during cross-examination brought out that she had never reported some of the facts to which she testified on direct examination.  Whether or not she had actually been accused of

stabbing her mother is not likely to have caused the jury to assess her credibility differently.  As such, the claim fails.

[LD 9 at 1.]

I likewise reject Baker's claim.  Baker has not provided here – and never provided to the state courts – the "reports" that he claims would have shed light on this matter.  [LD 8, 12, 14.]  It is therefore not possible to say that counsel's performance was deficient.  In any event, assuming that Baker refers to police reports regarding the incident, such reports would definitively establish D.B.'s conduct.

**2.**

Baker also alleges that defense counsel failed to introduce evidence that might cast doubt on the credibility of D.B. , L.L. and C.F.  Baker states that L.L. testified that she "did not tell the District Attorney that she would have known if [C.F.] had been molested."  [Pet. at 66.]  Baker argues that "[d]efense counsel did not produce evidence, readily available in prosecution discovery, that would have contradicted [L.L.]'s testimony."  [Pet. at 66.]

On cross-examination, L.L., who was C.F.'s sister, agreed that she had told the District Attorney's representative that C.F. had never mentioned to her that she had been molested.  [RT 684.]  Defense counsel asked L.L., "And you said, I was living in the same house at the time, and if there was going to be a thousand cases of molestation, I would have known about that, right?"  [RT 684.]  L.L. responded: "I said, how can this happen and nobody know."  [RT 685.]  She testified that she was speaking generally about herself and C.F.  [RT 685.]

The superior court rejected this claim, holding: "Petitioner does not attach this evidence to the petition and fails to describe it with any particularity.  As such, the claim fails."  Again, the superior court also rejected this claim on the merits,

stating: "Regardless, the matter was minor and not prejudicial to the jury's determination on the counts concerning victim D.B. (the only counts on which petitioner remained convicted following the appeal). The evidence of guilt regarding victim D.B. was strong and corroborated believably by the remaining evidence of the conduct regarding L.L. and C.F., and denial of the claim is required." [LD 9 at 2.]

I agree. Baker does not explain what "readily available" evidence trial counsel could have presented. This claim must fail for lack of any support. In any event, there was ample evidence that called L.L.'s and C.F.'s credibility into question. L.L. had denied having been molested by Baker when first asked by investigators. [LD 4 at 10.] L.L. had called C.F. an "habitual liar." [*Id*.] L.L. engaged in a conversation with a defense investigator in which money in exchange for not testifying against Baker was discussed. [*Id*.] L.L. told people that C.F. was a liar even after Baker's arrest. [LD 4 at 11.] The jury nevertheless found the trial testimony of the three victims credible on the substance of the charged crimes. Impeachment on this minor discrepancy, if it indeed existed, would not have mattered.

### 3.

Baker's next argument challenges the credibility of accuser C.F. Baker argues prosecution witness C.F. testified that she did not recall having told Child Protective Services that Baker's father, Harvey Baker, had molested her when she was seven years old. [Pet. at 66.] Baker contends that his trial counsel was ineffective for failing to obtain a Child Protective Services report confirming that C.F. did tell Child Protective Services about this molestation. [Pet. at 66.] According to Baker, this would have shown C.F.'s propensity to make false accusations.

On cross-examination, Baker's trial counsel questioned C.F. about other

accusations of sexual misconduct she had been involved in.  [RT 588-625.]  They

had the following exchange regarding Harvey Baker:

> Q [by defense counsel] You also told CPS [Child Protective
> Services] that the defendant's father digitally penetrated you also?
> A [by C.F.] Did I tell CPS that? No.
> Q Yeah.  Did you tell anybody that?
> A. I never talked to CPS about his father.
> Q No, no, no.  I know what you want to say.  [¶] Did you tell
> anybody that Harvey Baker digitally penetrated you; anybody, I don't
> care, CPS or anybody?
> A. I had told them that I felt threatened by his father because of
> the comments that he's made to me before and something that – an
> incident that happened.
> Q Did you tell him that, about the time that – tell anybody, and
> I don't know whether it's CPS, the officers, Heidi Smith [the
> prosecuting attorney], the District Attorney's Office – that when you
> were seven years old, Harvey Baker penetrated you with his finger?
> A I don't recall saying exactly that, no.
> . . . .
> Q Do you remember telling them that, Harvey was working on
> something and asked me to hand him a screwdriver – he picked up the
> screwdriver, pulled you close, you were wearing something loose
> fitting, and he moved his clothing aside and penetrated you with his
> finger?
> A Yes.
> Q So is it your testimony that didn't really happen?
> A No.  I didn't say it didn't happen.  I said the way that you
> worded it before is not how it happened.
> Q When I asked you whether or not you claimed that he had
> digitally penetrated you with his finger, was there something wrong
> about the wording there?
> A He didn't actually digitally penetrate me.
> Q Where you said –
> A He put his hands up on the sides of my clothes.

[RT 610-12.]

The superior court on habeas rejected Baker's claim that counsel should

have presented a Child Protective Services report confirming that C.F. had

reported that Harvey Baker molested her.  The superior court determined that the

evidence was immaterial  "to the jury's determinations on the counts concerning

victim D.B., as the evidence of guilt regarding victim D.B. was strong and

1    corroborated believably by the remaining evidence of the conduct regarding L.L.
2    and C.F." [LD 9 at 2.]

3           Baker fails to show that such a report exists or that it would be helpful.
4    Baker's claim of ineffective assistance is thus unsubstantiated claims.  In any
5    event, there was other evidence impugning C.F.'s credibility.  On cross-
6    examination, C.F. freely admitted to lying in connection with other matters.  C.F.
7    admitted that she fabricated an accusation that her mother and her boyfriend had
8    raped her.  [RT 606.]  C.F. also admitted that she had lied in a letter in which she
9    stated that D.B. was lying about her accusations.  [RT 588, 600.]  Baker's trial
10   counsel made the point that C.F. had made false accusations and statements in
11   regard to sex offenses.

12                                         **4.**

13          Scott Stairs was C.F.'s boyfriend and later her husband.  [RT 504, 640.]
14   According to C.F. and Stairs, C.F. told Stairs that Baker had molested her when
15   she was 15 or 16.  [RT 552, 640.]  Baker alleges that counsel should have obtained
16   the Child Protective Services report that verified that Stairs did tell Child
17   Protective Services that C.F. had told him she had never been molested.  [Pet. at
18   66.]  Baker alleges that counsel was ineffective for failing to present the relevant
19   Child Protective Services report.  [Pet. at 66.]

20          The superior court denied this claim because Baker failed to attach the
21   relevant transcript, and also on the merits: "This evidence was immaterial and the
22   jury received and considered Mr. Stairs testimony, which indicated C.F. may have
23   previously denied being molested.  When compared to the strength of the evidence
24   of guilt supporting the counts concerning victim D.B., prejudice is not shown and
25   denial of the claim is required."  [LD 9 at 2.]

26

1    There is no indication that a report reflects that Stairs so informed Child

2  Protective Services.  The testimony of Stairs and C.F. was consistent that, when

3  C.F. was fifteen or sixteen and dating Stairs, she told him that Baker had molested

4  her.  [RT 552, 640.]  Further, as discussed above, trial counsel did elicit prior false

5  statements made by C.F. and used them to argue that C.F. was not credible.

6                                         **5.**

7    Baker alleges that counsel was ineffective for failing to present

8  "corroborating witness testimony" to confirm that D.B.'s brother, Julian, told

9  police that nothing improper had happened with him, Baker, and D.B.  [Pet. at 66.]

10  Both D.B. and her brother, Julian, testified about an incident that had occurred

11  with Baker.  [RT 202-03, 404.]  Baker argues: "[Julian] testified that he did not

12  recall telling the police that nothing happened with petitioner, himself, and [D.B.].

13  [RT 413.]  Again, defense counsel did not produce corroborating witness

14  testimony to verify [Julian's] statement to police."  [Pet. at 66.]

15    On cross-examination, Baker's counsel asked Julian, "Did the police

16  officers ask you if anything happened with you and [Baker], and you remember

17  saying no, nothing happened?" [RT 413.]  Julian responded, "No, not really."  [RT

18  413.]  Then Julian clarified his response: "I said that when I was – when I went

19  into – I forgot his name.  This one – . . .  I went to this one place.  It was kind of

20  like a court place or something like that, and this guy came in and asked me what

21  happened and everything."  [RT 413-14.]  Baker's counsel asked, "And you said

22  nothing happened?"  [RT 414]  Julian said, "Yes."  [RT 414.]  Later on

23  cross-examination, Baker's counsel again asked, "[W]hen you first talked to them

24  [the police], you said nothing happened, right, the first time?" [RT 418.]  Julian

25  said, "Yes."  [RT 418.]  Julian also admitted that he did not tell the whole truth

26  about the incident in a videotaped statement.  [RT 418-19, 422.]

In denying Baker's state habeas petition, the superior court said: "Petitioner has not attached any of this evidence to the petition and fails to describe

it with any particularity.  As such, the claim fails . . ..  Regardless, [Julian's] testimony was before the jury and when compared with the strength of the evidence supporting guilt, no prejudice is shown to have resulted."  [LD 9 at 2.]

Baker's claim was defaulted as a procedural matter.  Further, Julian admitted on cross-examination that he lied after the incident and said that nothing happened.  [RT 414.]  There was therefore no need to prove a prior inconsistent statement. Assuming that such evidence existed and was admissible, it would be of questionable usefulness to the defense.  Julian was eight years old at the time of the incident; and was still only ten years old at the time of trial.

**6.**

Baker contends that defense counsel's performance was deficient because he failed to introduce a home video that would demonstrate that Baker had positive and normal family interactions with C.F. and L.L.  [RT 968-69, 1089.] Baker testified that his children and the other children in the family all loved him. [RT 968.]  He testified that L.L. and C.F. had liked him, and were never afraid of him.  [RT 968-69.]  He said, "I've seen home videos of us all interacting at family reunions."  [RT 969.]

In denying Petitioner's state habeas petition, the superior court said:

> Petitioner next claims that defense trial counsel was ineffective in not introducing a home video tape into evidence showing a positive interaction between petitioner, C.F. and L.L. in order to corroborate Petitioner's testimony that he had seen videos of family reunions showing that positive interaction.  Petitioner has not attached the video tape to the petition, nor does he represent to the court that such a video tape has been located and that he has access to it for purposes of this petition.  As such, the claim fails (*Harris, supra*).  Moreover, the probative value of a video tape depicting "positive interaction"

between petitioner, C.F. and L.L. in a benign social setting when other adults were present and there was no imminent threat of harm is speculative. Assuming such a video tape exists, it is unlikely its introduction into evidence would have led to a different verdict on the charges concerning D.B. . . . Petitioner also claims that defense trial counsel was ineffective in mentioning the video tape during closing argument but not introducing the video itself into evidence. The video tape is not attached to the petition and no representation has been made that it can be located and made available. However, petitioner testified to what was depicted on the tape and therefore defense counsel's reference to it in closing argument was proper and not ineffective.

[Lod. Doc. 9 at 2-3.]

Baker has not provided the videotape itself. Baker therefore cannot rebut the presumption that trial counsel employed sound trial strategy and exercised reasonably professional judgment in this regard. *See Strickland*, 466 U.S. at 689-90. He also cannot show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Assuming that there is a videotape available that depicts positive interaction between Baker and the children of the family, Baker fails to show prejudice.

**VI.**

CALJIC 10.60 states that corroboration of the victim's testimony by other evidence is not essential to a conviction. [*See* RT 1140.] It was read to the jury as follows: "It is not essential to a conviction of a charge of rape that the testimony of the witnesses with whom sexual relation is alleged to have been committed be corroborated by other evidence." [*Id.*]

Baker asserts that this instruction should not have been given in this case because "[t]he instruction was originally designed to dispel the perceived popular misconception that a rape victim's testimony is inherently untrustworthy and

therefore in need of corroboration. . . . [I]n the context of the present case, the

instruction has the unintended consequence of eliminating appropriate reasonable

doubts, when there is a lack of corroborating evidence . . ..” [Pet. at 56.]  Baker

complains that this instruction lightened the prosecution’s burden of proof and

that, in light of the flawed credibility of his accusers, “tipped the balance” against

him “and denied him a fair trial.”  [*Id*.]  Baker argues that the instruction

improperly relieved the prosecution of its burden of proof.  He argues that, “[i]f a

‘reasonable juror could have given the presumption conclusive or burden-shifting

effect,’ the instruction is unconstitutional” under *Sandstrom v. Montana*, 442 U.S.

510, 519 (1979); *Francis v. Franklin*, 471 U.S. 307 (1985), and *Houston v. Rose*,

177 F.3d 901, 909 (9th Cir. 1999); *Patterson v. Gomez*, 223 F.3d 959, 962 (9th

Cir. 2000).  [Pet. at 56.]  Baker asserts that a reasonable juror “would interpret

CALJIC 10.60 to mean that any failure to corroborate the victim is not relevant to

the victim’s credibility.”  [Pet. at 57.]  Baker argues that although the California

Supreme Court upheld CALJIC 10.60 in *People v. Gammage*, the challenge in that

case was different from that presented here.  2 Cal. 4th 693 (1992).

    This argument was raised in Baker’s post-trial motion for a new trial.  [CT

615; RT 1272.]  The trial court rejected it.  Furthermore, the court of appeal

rejected this claim, explaining as follows:

>     CALJIC No. 10.60, as defendant concedes, was approved by
> our state high court in *People v. Gammage* (1992) 2 Cal.4th 693.  In
> Gammage, the California Supreme Court concluded CALJIC No.
> 10.60 correctly states the law.  (*Id*. at p. 700.)  The court further held
> that giving this instruction in conjunction with CALJIC No. 2.27
> (“Sufficiency of Testimony of One Witness”) did not subject the
> victim’s testimony to a lower standard of scrutiny than that of other
> witnesses.  (*Id*. at pp. 700-702.)  As the court noted, CALJIC No. 2.27
> focuses on how the jury should evaluate a fact proved by one witness,
> while CALJIC No. 10.60 declares as a substantive rule of law that a
> complaining witness’s testimony requires no corroboration.  Neither
> instruction modifies the other.  (*Id*. at pp. 700-701.)  We are bound by
> Gammage.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57

Cal.2d 450, 455.)  Defendant here argues this instruction was improper because it had "the unintended consequence of eliminating appropriate reasonable doubts, when there is a lack of corroborating evidence which could have been presented if it existed." We disagree.

First, the instruction does not direct the jury to disregard the existence or nonexistence of corroborating evidence.  It simply informs them that corroboration is not "essential." This is the law.

Second, the jury was instructed it was required to consider the jury instructions as a whole and each in light of all the others. (CALJIC No. 1.01.)  In those other instructions, the jury was informed of the prosecution's burden of proving all of the charges beyond a reasonable doubt.  Further, the jury was instructed that in assessing the believability of the testimony of the witnesses, it could consider "anything that has tendency in reason to prove or disprove the truthfulness of the testimony of the witness, including but not limited to any of the following: . . . the existence or nonexistence of any fact testified to by the witness." (CALJIC No. 2.20.)  The jury was also instructed the testimony of a single witness does not require corroboration for the proof of the fact the witness testifies to and that it should carefully review all the evidence upon which the proof of that fact depends.  (CALJIC No. 2.27.)  Taken together, no reasonable juror could interpret these instructions in the manner suggested by defendant.

[LD 4 at 40-42.]

I conclude that Baker has failed to establish a ground for habeas relief on this basis.  Again, insofar as this is a claim of state law error, Baker fails to establish a basis for federal habeas corpus relief.  In *McGuire* the Supreme Court explained:

the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief. . . . Federal habeas courts therefore do not grant relief, as might a state appellate court, simply because the instruction may have been deficient in comparison to the CALJIC model. . . . The only question for us is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. . . .  It is well established that the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. . . . And we also bear  in mind our previous admonition that we have defined the category of infractions that violate fundamental fairness very narrowly.  Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.

502 U.S. at 71-73, 112 (internal quotation marks and citations omitted).

1      Insofar as Baker claims that the prosecution's burden of proof was lightened

2  by the trial court's instruction, I also disagree.  The Court explained in *In re*

3  *Winship*: "the Due Process Clause protects the accused against conviction except

4  upon proof beyond a reasonable doubt of every fact necessary to constitute the

5  crime with which he is charged."  397 U.S. 358, 364 (1970).  "In a criminal trial,

6  the State must prove every element of the offense, and a jury instruction violates

7  due process if it fails to give effect to that requirement."  *Middleton v. McNeil*, 541

8  U.S. 433, 437 (2004).

9      Applied to this case, however, CALJIC No. 10.60 accurately reflects the

10  law.  Baker argues that the instruction shifts the burden of proof by "eliminating

11  normal concerns with the lack of corroborating evidence" [Pet. at 56] and by

12  giving "special consideration to one category of witnesses" [Pet. at 60].  However,

13  the Ninth Circuit has held that CALJIC No. 10.60 does not lessen the

14  prosecution's burden of proof when given with other standard instructions on the

15  prosecution's burden of proof beyond a reasonable doubt.  *Bruce v. Terhune*, 376

16  F.3d 950, 955-56 (2004).  In this case, as in *Bruce*, the jury instructions viewed as

17  a whole were constitutionally sound.  Most importantly, the jury was instructed:

18  "A defendant in a criminal action is presumed to be innocent until the contrary is

19  proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown,

20  he is entitled to a verdict of not guilty.  This presumption places upon the People

21  the burden of proving him guilty beyond a reasonable doubt."  [CT 434.]  In light

22  of the entire charge to the jury, the prosecution was not relieved of the burden of

23  proving each element of the crimes beyond a reasonable doubt.

24      The state courts' decisions here were not contrary to, or an unreasonable

25  application of, clearly established federal law.  Baker's claim of instructional error

26  is without merit and is denied.

1

## VII.

2       For the forgoing reasons, Baker's petition for a writ of habeas corpus is

3  denied.

4

5  DATED: November 12, 2010          _/s/ J. Clifford Wallace_____
                                          J. Clifford Wallace
6                                         United States Circuit Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26